FILED
IN CLERKS OFFICE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

2005 FEB -9  A 10: 20

U.S. DISTRICT COURT
DISTRICT OF MASS.

---

SECURITIES AND EXCHANGE COMMISSION,

      **Plaintiff,**

    **v.**

**JAMES TAMBONE and**
**ROBERT HUSSEY,**

      **Defendants.**

---

**05**   **10247 NMG**

CIVIL ACTION
NO.

**TRIAL BY JURY**
**DEMANDED**

RECEIPT # _____
AMOUNT $ __N/A_____
SUMMONS ISSUED __2_____
LOCAL RULE 4.1 __✓_____
WAIVER FORM __✓_____
MCF ISSUED __✓_____
BY DPTY. CLK __M.P_____
DATE __2/9/05_____

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

MAGISTRATE JUDGE __MBB__

**SUMMARY**

1.     From as early as 1998 and continuing through September 2003, the Defendants, senior executives of Columbia Funds Distributor, Inc. ("Columbia Distributor"), entered into, approved, and knowingly permitted arrangements allowing certain preferred customers to engage in short-term or excessive trading and never disclosed this fact to other investors.

2.     During the relevant period, Columbia Distributor was the entity that distributed over 140 of the mutual funds in the Columbia mutual fund complex (the "Columbia Funds"). James Tambone ("Tambone"), Columbia Distributor's Co-President, and Robert Hussey ("Hussey"), its Managing Director for National Accounts, negotiated, approved or knowingly permitted arrangements with at least eight investors allowing them to engage in frequent short-

1

term trading in at least six different funds. Tambone and Hussey entered or approved the arrangements or allowed them to continue despite knowing such trading could be detrimental to long-term shareholders in the funds.

3.    The Defendants entered into, approved and/or knowingly allowed these arrangements despite the fact that they knew or suspected that these investors were engaged in "market timing." After entering into these arrangements, the eight investors engaged in frequent short-term or excessive trading in at least sixteen different Columbia Funds.

4.    Further, in connection with certain of the arrangements, Defendants insisted that traders provide so-called "sticky assets" – long-term investments that were to remain in place in return for allowing the investors to actively trade in the funds. In some cases, Defendants required investors who wanted to engage in frequent short-term trading in certain Columbia Funds to place long-term assets in other Columbia Funds. Such arrangements benefitted Tambone and Hussey, whose compensation depended significantly upon the level of sales by Columbia Distributor, and benefitted Columbia Distributor, which earned revenue based on the total amount of assets it caused to be invested in the funds. The arrangements also benefitted Columbia Management Advisors, Inc. and predecessor companies ("Columbia Advisors"), the investment adviser to the Funds, because it received advisory fees based on total assets under management. Columbia Advisors was aware of all but one of the arrangements. Although the arrangements benefitted Defendants, Columbia Distributor and Columbia Advisors, they posed risks for investors in the funds in which short-term trading was allowed.

5.    Throughout the relevant period, neither the Defendants nor Columbia Advisors and Columbia Distributors (collectively, the "Columbia Entities") ever disclosed to the long-term or prospective shareholders of the Columbia Funds or to the independent trustees of the Columbia

2

Funds the special arrangements they made with these short-term or excessive traders and the potential harm these arrangements posed to the relevant Columbia Funds. The Defendants and the Columbia Entities also did not disclose the resulting conflicts of interest these arrangements created between Columbia Advisors and its clients. Nor did the Defendants or the Columbia Entities disclose the conflicts of interest created by the disparate treatment of investors in the same fund, which was a result of these arrangements (*i.e.,* while investors with special arrangements were allowed to engage in frequent trading, those without such arrangements were not). These non-disclosures constituted material omissions of fact.

6.     Further, many of these arrangements and the trades made pursuant to them were directly contrary to certain representations contained in fund prospectuses that Columbia Advisors prepared, Columbia Advisors and Columbia Distributor issued, and Defendants used in offering and selling the funds directly or indirectly to clients and potential clients. The fund prospectuses represented to investors that the funds did not permit market timing or other short-term or excessive trading because of its harmful effect on the funds. In other cases, these arrangements and trades were contrary to prospectus representations that the funds involved would allow no more than three or four exchanges per fund per year.

7.     Columbia Advisors had a fiduciary duty to act at all times in the best interests of investors in the Columbia Funds it managed. As a result, it had an affirmative obligation to act in the utmost good faith, and to provide full and fair disclosure of all material facts, including conflicts of interest, to investors and to the independent trustees of the Columbia Funds. It further had an affirmative obligation to act with reasonable care to avoid misleading investors.

8.     By placing its own interest in generating fees from short-term or excessive traders above the interests of long-term shareholders to whom this trading posed a risk of harm, and by

3

allowing and failing to disclose these arrangements and the conflicts of interest they created, Columbia Advisors breached its fiduciary duty to shareholders in the funds where the short-term or excessive trading took place. Defendants aided and abetted Columbia Advisors' conduct insofar as they knew or were reckless in not knowing that the conduct was improper and they each knowingly rendered substantial assistance in this conduct.

9.      By engaging in the transactions and practices alleged in this Complaint,

      a.      Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5];

      b.      Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)];

      c.      Defendants aided and abetted Columbia Advisors' violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6 (1) and (2)];

      d.      Defendants aided and abetted Columbia Distributor's violations of Section 15(c)(1) of the Exchange Act [15 U.S.C. § 78o(c)].

10.     Unless enjoined, the Defendants will continue to engage in acts, practices, and courses of business as set forth in this Complaint or in acts, practices, and courses of business of similar object and purpose. Accordingly, the Commission seeks the following against each Defendant: (i) entry of a permanent injunction prohibiting him from further violations of the relevant provisions of the federal securities laws; (ii) disgorgement of all ill-gotten gains, plus prejudgment interest thereon; (iii) imposition of civil monetary penalties; and (iv) such other equitable relief as the Court deems just and appropriate.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and

Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Additionally, the acts and practices alleged herein occurred primarily within the District of Massachusetts.

12.     The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21 of the Exchange Act [15 U.S.C. § 78u] and Section 209 of the Advisers Act [15 U.S.C. § 80b-9].

13.     In connection with the conduct alleged herein, the Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or of the means and instruments of transportation or communication in interstate commerce.

## DEFENDANTS

14.     **James Tambone**, of Wellesley, Massachusetts, was Co-President of Columbia Distributor from November 2001 until April 2004. From 1997 to 2001, he served as Co-President of Liberty Funds Distributor, Inc. ("Liberty Distributor"), a predecessor of Columbia Distributor.

15.     **Robert Hussey**, of Bedford, Massachusetts, was Managing Director, National Accounts of Columbia Distributor from late January 2002 until March 2004. He had held the same position at Liberty Distributor from late 2000 to January 2002. Prior to that, from 1998 to late 2000, he had served as Senior Vice President of the Fee-Based Alliance Group at Liberty Distributor. Throughout the relevant period, he reported directly to Tambone.

## RELATED ENTITIES

16.     Columbia Management Advisors, Inc. ("Columbia Advisors"), an Oregon corporation formerly known as Columbia Management Company, is a wholly-owned subsidiary of Columbia Management Group, Inc. ("Columbia Management"), which during the

relevant period was a wholly-owned subsidiary of FleetBoston Financial Corporation ("Fleet").

On or about April 1, 2004, Bank of America Corporation became the successor to Fleet.

Columbia Advisors, which has offices in Boston, has been an investment adviser registered with

the Commission since 1969. In connection with its purchase of Liberty Financial Group

("Liberty") in November 2001, Fleet acquired various Liberty fund groups and investment

advisers. The Liberty investment advisers included Liberty Advisory Services Corp., Colonial

Management Associates, Inc., Stein Roe and Farnham Inc., Newport Pacific Management, Inc.,

Newport Fund Management, Inc., and Columbia Funds Management Company. In April 2003,

these entities were merged with Fleet Investment Advisors Inc. into Columbia Advisors. (Six of

the Columbia Funds, including the Acorn Fund Group, continue to be advised by a separate

entity, Columbia Liberty Wanger Asset Management, LP.) Columbia Advisors is presently the

sponsor of approximately 140 Columbia Funds and remains responsible for all representations

made in the prospectuses for those funds.

    17.  Columbia Funds Distributor, Inc. ("Columbia Distributor"), a

Massachusetts corporation with offices in Boston, is a wholly-owned subsidiary of Columbia

Management and during the relevant period was an indirect subsidiary of Fleet. Columbia

Distributor has been a broker-dealer registered with the Commission since 1992. It acts as the

principal underwriter and distributor for the Columbia Funds and, in this role, disseminates the

prospectuses for the Columbia Funds. Prior to the Liberty acquisition in November, 2001, it

went by the name of Liberty Funds Distributor, Inc. When Fleet acquired the Liberty funds, it

kept in place the organization and management of Liberty Distributor, Inc. Tambone, who had

been Co-President of Liberty Distributor, became Co-President of Columbia Distributor, and

Hussey maintained his position reporting to Tambone.

18.    Columbia Fund Services, Inc. ("Columbia Services"), a subsidiary of Columbia Management, is the transfer agent for the Columbia Funds, with responsibility for identifying market timing activity in the funds. Prior to the acquisition of Liberty in November 2001, it was called Liberty Fund Services, Inc.

## FACTS

### Defendants' Sales Mission

19.    As Co-President of Liberty Distributor, then Columbia Distributor, during the relevant period, Tambone was responsible for sales and marketing of the Liberty, then Columbia, funds, both directly and through intermediaries, such as financial advisers.

20.    As Senior Vice President of the Fee-Based Alliance Group of Liberty Distributor from 1998 to late 2000, Hussey was responsible for selling the funds to investment advisers and others to invest in on behalf of their clients. Hussey then assumed additional responsibility for Liberty's National Accounts group, which maintained relationships between Liberty and broker-dealers through whom Liberty distributed its funds. Hussey's title was changed to Managing Director, National Accounts. In early 2002, Hussey gave up official responsibility for the Fee-Based Alliance Group, but continued as head of the National Accounts group until August 2003. He also continued to be involved in efforts to sell the funds to investment advisers, hedge funds and others.

21.    During the entire relevant period, Tambone's and Hussey's compensation depended in significant part on mutual fund sales. Tambone's compensation was comprised of a salary, a bonus based on net sales, and a commission based on gross sales. The commission comprised over half of his compensation. Similarly, over half of Hussey's total annual compensation was comprised of commissions he received on the basis of fund sales.

7

**Market Timing**

22.     Market timing includes (a) frequent buying and selling of shares of the same mutual fund or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal *per se*, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer.

**The Funds' Disclosures**

23.     The Columbia Funds are a group of funds that were owned by Fleet. This group includes several funds (*e.g.*, the Acorn, Newport, and Stein-Roe fund groups) that had belonged to Liberty until late 2001, when Liberty was acquired by Fleet. By September 2003, the names of the various fund groups Fleet owned had been changed so that all were uniformly referred to by the name Columbia.

24.     From 1998 through 2000, the prospectuses for various of the Columbia Funds contained disclosures stating that shareholders would be limited in the number of exchanges they could make during a given period. For example, the prospectuses for the Acorn Fund Group represented that investors would generally be permitted to make only up to four round trip exchanges per year, defining a round trip as an exchange out of one fund into another fund and then back again.

25.     Further, starting in May 1999, certain of the Columbia Funds belonging to the Acorn Fund Group began representing in their respective prospectuses that "[t]he Acorn funds do not permit market-timing and have adopted policies to discourage this practice."

8

26. In the fall of 2000, a number of the Columbia Funds belonging to Liberty at the time began including in their respective prospectuses the following disclosure, which expressly stated that short-term or excessive trading was prohibited (the "Strict Prohibition"):

> The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund. The funds into which you would like to exchange may also reject your request.

27. By the spring of 2001, the rest of the Columbia Funds belonging to Liberty began including the Strict Prohibition in their prospectuses. Columbia Advisors retained this disclosure language upon Fleet's acquisition of the funds from Liberty, and in early 2002, adopted the same disclosure for most of the funds that had belonged to Fleet prior to the acquisition. In the Spring of 2003, Columbia Advisors amended the Strict Prohibition language in certain of the prospectuses to make clear that other funds distributed by Columbia Distributor similarly reserved the right to reject trade requests from market timers or investors with a pattern of short-term or excessive trading.

28. Tambone and Hussey knew or were reckless in not knowing of the prospectus disclosures for the Columbia Funds they sold. They also knew or were reckless in not knowing that they had to act consistently with these disclosures.

### Defendants Agreed to Allow Short-Term or Excessive Trading In Columbia Funds, in Contravention of Disclosures

29. During the period from at least 1998 and continuing through summer 2003, as Columbia Distributor executives, Tambone entered, approved or knowingly allowed at least six, and Hussey entered into, approved or knowingly allowed at least seven, arrangements with

investment advisers, hedge funds and brokers allowing them to engage in frequent trading in particular mutual funds. The investors with the arrangements made multiple "round trips" (each round trip consisting of a purchase and subsequent sale) per month and some made hundreds of round trips during this approximately five-year period, in amounts totaling approximately $2.5 billion. Further, much of this trading was directly contrary to the prospectus disclosure for the funds in which it occurred. Columbia Advisors knew and approved of all but one of these arrangements.

### A. *Ilytat's Arrangement and Trading*

30.    From April 2000 through October 2002, Ilytat, L.P., a San Francisco hedge fund, and its affiliates ("Ilytat") made almost 350 round trips in seven international Columbia Funds. A substantial number of these trades were made pursuant to an arrangement approved by Hussey, with Tambone's knowledge, which allowed Ilytat to engage in frequent and short-term trading in the Newport Tiger Fund (the "Newport Tiger Fund"), an Asian equity fund. Columbia Advisors initially approved the arrangement.

31.    Through 2000 and early 2001, the prospectus for the Newport Tiger Fund noted that "[s]hort-term 'market timers' who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders." Starting in May 2001, the prospectus included the Strict Prohibition representation.

32.    Notwithstanding the language in the prospectus, in or about early 2000 Hussey met with Ilytat's principals, and discussed and approved a "sticky assets" arrangement, under which Ilytat would place $20 million in the Newport Tiger Fund, with two-thirds of that amount to remain static and one-third to be actively traded. Tambone approved or became

10

aware of the arrangement in or before October 2000. According to internal calculations for the Newport Tiger Fund, during 2000, Ilytat made purchases or exchanges totaling over $133 million in the fund and redeemed $104 million. Further, during the first five months of 2001, Ilytat's purchases or exchanges accounted for $72 million out of the $204 million in total purchases made by all investors in the Newport Tiger Fund. During the same five-month period, Ilytat made redemptions totaling $60 million.

33.    By June 2000, a senior executive of Columbia Advisors became concerned that Ilytat appeared to be making weekly trades of $7 million in and out of the Newport Tiger Fund. Beginning no later than October 2000, the portfolio manager for the Newport Tiger Fund, who had initially approved the arrangement, repeatedly wrote to Tambone and Hussey expressing concern about Ilytat's trading activity and the harm that this trading activity could have on the fund and its investors.

34.    In October 2000, in an e-mail to Tambone, Hussey and others discussing Ilytat, the portfolio manager stated: "[T]heir active trading has increased and it has become unbearable. There will be long term damage to the fund." He further noted, "Let's understand that they [timers] really are not investors. They take advantage of the fund's delayed pricing mechanism which almost guarantees a risk free return . . . I hope wholesalers understand that by accepting a flipper's [*i.e.,* a short-term trader's] investment they do damage to the fund's performance, tax status, and the other shareholders (their clients)." In his response, which was copied to Tambone, Hussey set forth guidelines for such arrangements, which included:

- Identify and close a long-term asset stream as a quid-pro-quo to any short-term movements;

11

- Dictate that any short-term movements must use a Liberty money market option to ensure gross sales are not artificially inflated and to ensure that Liberty generates constant management fee income;

- Bring the potential relationship to the attention to[sic] the relevant investment management team early; and

- Monitor the relationship to ensure the investment management team's comfort.

Hussey also stated that the Ilytat arrangement followed these guidelines.

35.    Tambone and Hussey, however, ignored the portfolio manager's concerns about the negative impact of Ilytat's trading on his fund. Although Hussey represented that he would halt Ilytat's trading, in fact neither Hussey nor Tambone took any steps, or caused others to take steps, to restrict or stop Ilytat and Ilytat continued to engage in short-term and frequent trading.

36.    In March 2001, in another e-mail sent to Tambone, Hussey and others, the Tiger Fund portfolio manager stated that "Newport . . . and the fund's long-term shareholders are all negatively impacted by flippers" and he suggested that action be taken. Neither Tambone nor Hussey, however, took any action or caused anyone else to take action to halt Ilytat's trading. On other occasions, the portfolio manager and his superior spoke directly Tambone about market timing issues, including concerns about the negative impact on his funds that frequent movements of large amounts of cash in and out of the fund could have, making it difficult to manage the funds. Notwithstanding these concerns, neither Tambone or Hussey took any action to halt Ilytat's trading.

37.    Hussey instead took affirmative steps to shield Ilytat from any action by the Columbia Service personnel charged with detecting and halting market timing in the funds. By March 2001, with Hussey's approval, Ilytat had been placed on a list of "Authorized

12

Accounts for Frequent Trading," a list of accounts maintained by Columbia Services against which no action was to be taken, however frequent their trading. In addition, Hussey directly intervened to block efforts by surveillance or operations personnel to halt Ilytat's timing activity in the Tiger Fund. In 2002, for example, Hussey reversed a stop placed on Ilytat's trading by Columbia Services market timing surveillance personnel. Ilytat continued trading for almost three more months thereafter.

38.    Ilytat was allowed to continue trading in the Newport Tiger Fund until September 2002. During the 30 months from April 2000 to September 2002 during which it actively traded in the Newport Tiger Fund, Ilytat made almost 90 round trips in amounts of up to $13 million apiece. This activity included over 30 round trips during the period from May 2001 through September 2002, when the fund's prospectus contained the Strict Prohibition representation.

39.    Ilytat also traded extensively in the Acorn International Fund during the period from September 1998 through October 2003. From September 1998 through September 2000, the prospectus for the fund stated that investors would be permitted to make only up to four round trips per year. Further, as of May 1999, the prospectus for the fund stated that market timing would not be permitted in the fund. In addition, by the end of September 2000, the Strict Prohibition representation was included in the fund's prospectus.

40.    Despite these representations, from September 1998 through October 2003, Ilytat made 73 round trips in the Acorn International Fund, including 27 round trips in 1999 and 18 round trips in 2000. From July 2000 to December 2001, the period during which it most actively traded the fund, Ilytat made at least 40 round trips in the fund in amounts of up to $15

13

million. This activity included 27 round trips made after the Strict Prohibition representation had been included in the fund's prospectus.

41.    In March 2001, Hussey intervened when a portfolio assistant to the Acorn International Fund had telephoned the broker responsible for the Ilytat account and asked him to stop Ilytat from violating the fund's short-term trading policy.  Hussey caused the Columbia Services manager responsible for market timing surveillance to telephone the portfolio assistant and tell her that it was "inappropriate" for her to take any direct steps to halt Ilytat's trading.  In December 2001, Hussey's subordinate, copying Hussey on his e-mail, intervened when the portfolio manager for Acorn International Fund complained about Ilytat's market timing adversely impacting her fund and tried to halt it.  Ilytat was allowed to continue trading.

42.    Ilytat also traded extensively in the Acorn International Select Fund during the period from July 2000 through June 2001.  Throughout this period, the prospectus for the Acorn International Select Fund included the Strict Prohibition representation.  Contrary to this representation, from July 2000 to June 2001, Ilytat made about at least 20 round trips in the Acorn International Select Fund in amounts of up to $3 million.

43.    In addition, from September 1999 through October 2000, Ilytat also made more than 40 round trips (over 10 in 1999 and over 30 in 2000) in amounts of $100,000 or more in the Acorn International Select Fund, which went by the name Acorn Foreign Forty Fund at the time.  This trading activity was contrary to the representation in the prospectus for the fund that traders would be restricted to four trades per year and further, that market timing would not be permitted.

44.    From August 2000 through October 2000, Ilytat also actively traded in the Stein Roe International Fund, making over 80 round trips of up to $1.4 million during this three-

month period. In addition, from April 2000 to September 2000, Ilytat actively traded in the Newport International Equity Fund, making approximately 19 round trips during this five-month period in amounts of up to $2 million. During the eight-month period from February 2002 to October 2002, Ilytat also made at least 10 round trips of up to $16 million in the Columbia International Equity Fund (formerly the Galaxy Equity Growth Fund) .

45.    Neither the Defendants nor the Columbia Entities disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Ilytat or Ilytat's trading in the Columbia Funds.

**B.    *Ritchie's Arrangement and Trading***

46.    From January 2000 through September 2003, Ritchie Capital Management, Inc. ("Ritchie"), a hedge fund manager, traded frequently in the Newport Tiger Fund and the Columbia Growth Stock Fund (formerly the Stein Roe Advisor Growth Stock Fund) ("Growth Stock Fund").

47.    Ritchie made most of its trades in the Newport Tiger Fund. During the period from January 2000 through April 2001, notwithstanding the language in the fund's prospectus regarding the potential harm caused by short-term market timers, Ritchie made over 150 round trips. In addition, from May 2001 through September 2002, Ritchie made over 100 trades in the Newport Tiger Fund even though the prospectus included the Strict Prohibition representation during this period.

48.    In late 2001, Hussey's direct report met with Ritchie's principals and discussed the possibility of a "sticky-asset" arrangement. More specifically, they discussed the possibility of Ritchie placing "long-term" assets in a fixed income fund "to offset their activity in Tiger." In an e-mail to Hussey, the subordinate summarized the proposal as follows: "we

15

would need to see some money from them . . . if they were going to continue to use Tiger." At the time, Ritchie's $52 million position in the Newport Tiger Fund accounted for nearly 10% of its $525 million in assets.

49.    In early 2002, Ritchie began negotiating with Columbia Distributor an arrangement to actively trade the Growth Stock Fund, a large cap fund, which by then included the Strict Prohibition disclosure in its prospectus. Ritchie proposed to place up to $200 million in the fund (which at that time had a total asset value of approximately $776 million), with the ability to trade up to $20 million every day. Shortly thereafter, Ritchie began trading in the Growth Stock fund, making five round trips in two months in amounts of up to $7 million.

50.    In early 2003, Hussey traveled to meet with Ritchie's principals, and Ritchie entered into a "sticky-asset" arrangement with Columbia Distributor, approved by Tambone and Hussey, under which it agreed to place $20 million in the Growth Stock Fund, trade up to $2 million at a time with no limits on the number of trades per month, and place another $10 million in the Columbia Short Term Bond Fund as a "static" (non-trading) asset. Columbia Advisors' portfolio manager for the fund was involved in the negotiations and approved the arrangement. Overall, pursuant to its arrangements with Columbia Distributor and contrary to Columbia Advisors' Strict Prohibition representation in the fund's prospectus, Ritchie made approximately 18 round trips in the Growth Stock Fund from June 2002 through September 2003.

51.    Neither the Defendants nor the Columbia Entities disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Ritchie or Ritchie's trading in the Columbia Funds.

### C.    *Stern's Arrangements and Trading*

52.    During late 2002 and early 2003, entities controlled by Edward Stern ("Stern") negotiated trading arrangements with Columbia Distributor through two intermediaries. In early 2003, Epic Advisors, on behalf of Stern's Canary Investment Management firm, entered into an arrangement with Columbia Distributor, approved by Tambone and one of his direct reports, under which Stern entities agreed to make investments in three funds (*i.e.*, the Columbia Growth & Income Fund, the Columbia Select Value Fund, and the Growth Stock Fund), totaling $37 million. Despite the fact that Columbia Advisors had included the Strict Prohibition disclosure in the prospectus for each of these three funds, the arrangement permitted Stern entities to make three round trips per month in each fund. Stern withdrew from the arrangement only a couple of weeks after making the investment.

53.    In late 2002 or early 2003, Stern also entered into an arrangement with Columbia Distributor pursuant to which he placed $5 million in the Columbia High Yield Fund (the "High Yield Fund"), a high-yield bond fund. Despite the fact that Columbia Advisors had included the Strict Prohibition disclosure in the prospectus for the High Yield Fund, Stern was permitted to make one round trip each month in the fund. The portfolio manger for the High Yield Fund approved the arrangement. During the period from November 2002 through July 2003, Stern made seven round trips in an average amount of $2.5 million.

54.    Neither Tambone nor the Columbia Entities disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Stern or Stern's trading in the Columbia Funds.

17

### D.    *Calugar's Arrangement and Trading*

55.    In or around April 1999, Daniel Calugar ("Calugar"), an investor specializing in timing mutual funds, reached an arrangement with Columbia Distributor, approved by Hussey, allowing him to place up to $50 million in the Columbia Young Investor Fund ("Young Investor Fund"), a fund targeting investments by children with an "educational objective to teach children about mutual funds", and the Growth Stock Fund, with permission to make one round trip per month using his entire position. The portfolio manager for the funds approved the arrangement.

56.    In May 1999, Hussey received notice that Calugar had made eight exchanges in the Growth Stock Fund since opening his accounts the previous month. Hussey expressed no concern about Calugar's frequent trading, and responded to the notice by giving instructions to ensure that he and his group received commission credit for Calugar's purchases. In June 1999, Hussey again sent an e-mail stating that he wished to be sure Calugar's purchases were credited on the sales report used to calculate commissions.

57.    By the beginning of 2000, Hussey had learned that Calugar was continuing to trade frequently and wrote to his subordinate, "This is getting ridiculous. We've got to slow the Calugar boys down." Shortly thereafter, however, in an e-mail to Tambone, he referred to Calugar as a "profitable relationship" which was an "exceptional economic bet without disrupting portfolio management or inflating sales." A month later, in another e-mail to his subordinate, he stated, "Whoa, Nellie!  I think this is getting a little out of control." Despite his expressions of concern, however, Hussey took no action to halt Calugar's trading, Tambone despite his notice of the arrangement took no action, and Calugar continued to trade.

18

58.    In 2000, Calugar, on average, made more than one round trip every trading day in various of the Columbia Funds. Throughout the year, Calugar made over 200 round trips in the Young Investor Fund, placing trades of up to $2.3 million at a time, and during the four-month period from January 2000 through April 2000, he also made at least 13 round trips in the Stein Roe International Fund.

59.    During the period from January 2000 through February 2001, Calugar also made nearly 70 round trips in the Growth Stock Fund, placing trades of up to $4 million at a time. Throughout 2000 and into January 2001, he also made approximately 20 round trips in the Newport International Equity Fund, in amounts of up to $6.6 million.

60.    In early 2001, a surveillance manager informed Hussey that Calugar was making round trips every two days, in amounts of up to $3.5 million. Although Hussey suggested that the surveillance manager call Calugar and "fire a warning shot," he took no other action to halt Calugar's trading. Calugar continued trading after adoption of the Strict Prohibition in the funds' prospectus disclosure in early 2001. He traded through at least August 2001.

61.    Neither Tambone, Hussey nor the Columbia Entities disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Calugar or Calugar's trading in the Columbia Funds.

E.    *Giacalone Arrangement and Trading*

62.    In late 2000, Tambone approved a "sticky-asset" arrangement between Columbia Distributor and broker Sal Giacalone ("Giacalone"). Under the arrangement, Giacalone was allowed to make four round trips per month of up to $15 million in the Newport Tiger fund. In return, Giacalone was required to place $5 million in "long term assets" in Acorn

19

Funds. The arrangement was approved by the head of the Newport Fund Group.

63. Notwithstanding the supposed terms of his arrangement and the language in the prospectus discussing the potential harm caused by short-term market timers, Giacalone made a total of 43 round trips in the Newport Tiger Fund during six months of trading from November 2000 through April 2001. During the first two months of 2001 alone, Giacalone made at least 30 round trips in amounts of up to $4.7 million.

64. In early 2001, a sales executive subordinate to Tambone halted efforts by Columbia Services timing surveillance personnel to stop Giacalone from making almost daily round trips in the Newport Tiger Fund. In an e-mail to the surveillance personnel who had ordered the halt, the executive stated, "Jim Tambone . . . agreed that Sal could utilize our Fund Family. I would suggest contacting . . . before canceling any trades. Trades should not be canceled." Although the Giacalone accounts were subsequently shut down, the interference delayed the process and allowed a substantial number of additional trades to be made.

65. Neither Tambone nor the Columbia Entities disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Giacalone or Giacalone's trading in the Columbia Funds.

### F.    *D.R. Loeser Arrangement and Trading*

66. In late 1998, Hussey approved an arrangement with D. R. Loeser ("Loeser"), a registered investment adviser, allowing Loeser to make five round trips per month of up to $8 million in the Growth Stock Fund. Hussey approved the arrangement although a subordinate informed him that Loeser might previously have been barred from the funds because it had engaged in excessive trading. Although Hussey had expressed concern that an investment adviser such as Loeser "who trades an estimated 24-60 round trips per year is not our target," he

20

concluded, "Let's accept the D.R. Loeser relationship." The President of the Stein-Roe fund complex, to which the Growth Stock Fund belonged at that time, and the Growth Stock Fund portfolio manager, both approved the arrangement.

67.    In February 2000, Hussey sent an e-mail to Tambone referring to existing "profitable relationships" including Loeser. Neither Tambone nor Hussey took any action to halt Loeser's trading. During the first five months of 2000, Loeser made approximately 20 round trips in the Growth Stock Fund and another 20 round trips in the Young Investor Fund.

68.    Neither Hussey, Tambone nor the Columbia Entities disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Loeser or Loeser's trading in the Columbia Funds.

### G.    _Signalert Arrangement and Trading_

69.    Beginning in 1999, Hussey approved an arrangement with Signalert, a registered investment adviser. Initially, Signalert was allowed to invest $7.5 million in the Growth Stock Fund and $7.5 million in the Young Investor Fund, with the ability to make up to 10 round trips annually in each of these two funds. Under the arrangement, Signalert was also to place $5 million in each of six other funds, trading just once a quarter.

70.    Hussey subsequently pushed to increase the size of Signalert's investments. He wrote to his immediate subordinate, "I thought I gave you the green light to go to $10 million in Growth Stock and Young Investor you pussy." In late 1999, as part of a "sticky-asset" arrangement, Signalert agreed to place an additional $10 million in the Growth Stock and Young Investor funds, and to invest and maintain other assets in a money market fund, thereby allowing Columbia Distributor to generate a management fee from those assets. In

21

return, Columbia Distributor allowed Signalert to make up to 12 round trips per year in each fund. The portfolio manager for both funds approved this arrangement.

71.    During the first 11 months of 2000, notwithstanding the supposed terms of the arrangement, Signalert made over 60 round trips in the two funds, one every one to two weeks. Columbia Services market timing surveillance personnel conveyed their concern about this trading to Hussey. In May 2000, surveillance personnel informed Hussey that during the first four months of 2000, Signalert had made twenty exchanges in the Growth Stock Fund and asked, "In light of our recent conversations about market timing, does this cause you any concern or is this acceptable 'asset allocation'?!" Hussey took no action and Signalert continued to trade.

72.    Overall, during the period 2000-2001, Signalert made more than 50 round trips in the Growth Stock Fund and approximately 50 round trips in the Young Investor Fund. Moreover, as of February 2001, Columbia Advisors had represented by way of the Strict Prohibition disclosures in the prospectuses for these funds that short-term or excessive trading would not be permitted. Yet, from February 2001 through August 2001, Signalert made 20 round trips in the Young Investor Fund. It also made over 20 round trips in the Growth Stock Fund from February 2001 through December 2001.

73.    Signalert also began trading in four additional funds: the Stein Roe Income Fund (a bond fund), the Acorn Fund (a small to mid cap fund), the Galaxy Equity Value Fund (a large cap fund), and the Galaxy Growth & Income Fund. Despite the fact that the Stein Roe Income Fund and the Acorn Fund both included the Strict Prohibition representation in their prospectuses, Signalert made eight round trips in the Stein Roe Income Fund, all in the month of November 2001, and at least 15 round trips in the Acorn Fund during the period from March

22

2001 through February 2003. In addition, notwithstanding the fact that the two Galaxy funds generally limited investors to three exchanges per year, Signalert made approximately 23 round trips in the Galaxy Equity Value Fund and more than 25 round trips in the Galaxy Growth & Income Fund in a period of less than a year, from February 2001 through January 2002.

74.    Neither Hussey nor the Columbia Entities disclosed to the investors or to the independent trustees of the Columbia Funds the arrangement with Signalert or Signalert's trading in the Columbia Funds.

### H.    *Tandem's Arrangement and Trading*

75.    By early 2000, Tandem Financial ("Tandem"), an investment adviser, entered into an arrangement with Columbia Distributor. The arrangement permitted Tandem to make an unlimited number of trades in one or more of the Columbia Funds. Overall, pursuant to this arrangement, during the period from February 2000 through September 2003, Tandem made more than 100 round trips in the Tax Exempt Fund.

76.    During 2000, Tandem made approximately eleven round trips in the Tax-Exempt Fund. Starting in April 2001, the prospectus for the Tax Exempt Fund prospectus included the Strict Prohibition disclosure. Despite the disclosure, Tandem made 106 round trips during the period from April 2001 through September 2003.

77.    In early 2003, a sales manager subordinate to Tambone intervened when Columbia Services sought to block Tandem from making any more trades in the Tax-Exempt Fund. She wrote to the Columbia Services market surveillance manager, "Tandem Fin'l . . . are[sic] an advisor that we have a very close relationship with. We definitely do not want to restrict them," and further stated that "there are certain relationships like Tandem that are allowed to time based on prior discussions." The market timing surveillance manager forwarded

23

the e-mail to Hussey and asked to discuss the market timing with him. However, Tandem was allowed to continue trading in the Tax Exempt Fund up through September 2003.

78.    Neither Hussey nor the Columbia Entities disclosed to the investors or the independent trustees of the Columbia Funds the arrangement with Tandem or Tandem's trading in the Columbia Funds.

79.    In addition to the arrangements described above, Hussey actively considered others. For example, in Spring 2000, Hussey expressed willingness to approve an arrangement under which CIBC Oppenheimer would be allowed to make 25 round trips per year in the Growth Stock or Young Investor funds in exchange for "a minimum long term commitment of $5 million to a Liberty fixed income product." Although Hussey expressed concern that "the perception by senior management may become that we're only about timers," he sent a memo to Tambone asking him to support the Oppenheim proposal because of the "tangible benefits" it would bring.

## Defendants Knew That Short-Term or Excessive Trading Harmed or Created a Risk of Harm to the Funds

80.    Tambone and Hussey knew or recklessly disregarded that short-term or excessive trading caused potential or actual harm and disruption to the Columbia Funds. In addition to the knowledge set forth above, for example:

(a)    In the spring of 2000, shortly after the peak of Calugar's trading in the Stein Roe International Fund, the fund's liaison with Columbia Distributor sent an e-mail to Tambone and others with a chart that he summarized as showing: "for the last 6 weeks . . . $142,018,026 has gone into the Fund and $134,935,372 has gone out. . . .These figures exceed the total size of the Fund!" He continued, "My goal here is to increase awareness of the magnitude of this problem and to get everyone involved working on a solution on a timely basis."

(b)    In September 2002, in a report distributed to Hussey, Columbia Services stated that, "Despite the tools currently available to us, timers continue to disrupt fund

24

performance and management as well as exaggerate sales figures."

81.    Notwithstanding the concerns raised about the impact this excessive or short-term trading was having on the relevant Columbia Funds, Tambone and Hussey continued to allow such trading to take place.

## Defendants Interfered With Efforts to Halt Short-Term or Excessive Trading

82.    Tambone and Hussey recognized their obligation to act consistently with fund disclosure prohibiting short-term or excessive trading, and professed to want to prevent short-term or excessive traders from investing in the Columbia Funds.  For example, Tambone at an executives' meeting in July 2001 stated that Columbia Distributor personnel would monitor known timers and "catch what they can." Hussey, meanwhile, was the designated contact at Columbia Distributor for inquiries by the market timing surveillance personnel about apparent timers.

83.    In fact, however, on multiple occasions, Tambone and Hussey blocked or allowed their subordinates to block efforts to halt their clients' trading activity.  In addition, Hussey as the market timing surveillance contact participated in creating a list of "Accounts Approved for Frequent Trading," (including Ilytat) against which surveillance personnel were instructed to take no action. As the market timing surveillance manager described procedures in an e-mail he forwarded to Hussey, "I review 3 different reports each day that reflect accounts fitting this criteria [the definition of market timers].  After these accounts are located, I take action against some of them. The accounts that are recognized as timers (that do not have some kind of existing relationship with us) merit trade cancellations and placement of account stops. The accounts that are allowed to trade (due to a sales relationship) are ignored."

25

84.    Tambone resisted efforts to curb market timing. He expressed concern about the effect measures to curb timing would have on sales compensation. He also refused to change the compensation structure for Columbia Distributor salespeople, insisting that the major part of their compensation remain based 100% on gross sales, rather than net sales.

**FIRST CLAIM**
**Fraud in the Purchase or Sale of Securities in Violation of**
**Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

85.    Plaintiff Commission repeats and realleges paragraphs 1 through 84 above.

86.    Tambone and Hussey, directly or indirectly, acting knowingly or recklessly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

87.    The conduct of Tambone and Hussey involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

**SECOND CLAIM**
**Fraud in the Offer or Sale of Securities in Violation of**
**Section 17(a) of the Securities Act**

88.    Plaintiff Commission repeats and realleges paragraphs 1 through 87 above.

26

89.    Tambone and Hussey, directly and indirectly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails:  (a) acting knowingly or recklessly, have employed or are employing devices, schemes or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities, in violation of § 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM
### Aiding and Abetting Columbia Advisors' Violations of Sections 206(1) and 206(2) of the Advisers Act

90.    Plaintiff Commission repeats and realleges paragraphs 1 through 89 above.

91.    Columbia Advisors was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

92.    Columbia Advisors, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:  (a) acting knowingly or recklessly, has employed devices, schemes, or artifices to defraud; or (b) has engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

93.    By virtue of this conduct, Columbia Advisors has violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

94.    Tambone and Hussey knew or recklessly disregarded that Columbia Advisors' conduct was improper and each knowingly rendered to Columbia Advisors substantial assistance in this conduct.

27

95.    As a result, Tambone and Hussey aided and abetted Columbia Advisors' violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

### FOURTH CLAIM
### Aiding and Abetting Columbia Distributor's Fraud
### In Violation of Section 15(c) of the Exchange Act

96.    Plaintiff Commission repeats and realleges paragraphs 1 through 95 above.

97.    During the period from early 1998 through August 2003, Columbia Distributor was a broker or dealer as those terms are defined by Section 3(a)(4) and (5) of the Exchange Act [15 U.S.C. § 78c(a)(4),(5)].

98.    During the period from early 1998 through August 2003, Columbia Distributor, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting knowingly or recklessly, effected transactions in, or induced or attempted to induce the purchase or sale of securities (otherwise than on a national securities exchange of which it was a member) by means of a manipulative, deceptive, or other fraudulent device or contrivance.

99.    Columbia Distributor disseminated mutual fund prospectuses that made untrue statements of a material fact or omitted to state facts necessary in order to prevent the statements made, in the light of the circumstances under which they were made, from being materially misleading.

100.    By virtue of this conduct, Columbia Distributor violated § 15(c) of the Exchange Act [15 U.S.C. § 78o(c)].

101.    Tambone and Hussey knew or recklessly disregarded that Columbia Distributor's conduct was improper and each knowingly rendered to Columbia Distributor substantial assistance in this conduct.

28

102.    As a result, Tambone and Hussey aided and abetted Columbia Distributor's

violations of Section 15(c)(1) of the Exchange Act [15 U.S.C. §78(o)c].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully requests that this Court issue a Final

Judgment:

### I.

Permanently enjoining each of Tambone and Hussey from violating, directly or

indirectly:

    a.   Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

    b.   Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

    c.   Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)]; and

    d.   Section 15©)(1) of the Exchange Act.

### II.

Requiring Tambone and Hussey to disgorge their ill-gotten gains related to the violations,

as well as prejudgment interest thereon;

### III.

Requiring Tambone and Hussey to pay civil monetary penalties pursuant to Section 20(d)

of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] in an amount to be

determined by the Court; and

**IV.**

Ordering such other and further relief as this case may require and the Court deems appropriate.

**JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE
COMMISSION

By its attorneys,

Luke T. Cadigan
  Senior Trial Counsel (BBO# 561117)
Celia Moore
  Deputy Asst. Dist. Administrator (BBO# 542136)
David London
  Senior Counsel (BBO# 638289)

73 Tremont Street, Suite 600
Boston, Massachusetts
(617) 573-8919 (Cadigan)
(617) 424-5940 (Facsimile)

Dated: February 9, 2005

30

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**

JAMES TAMBONE
ROBERT HUSSEY

FILED

2005 FEB -9 A 10 20

U.S. DISTRICT COURT
DISTRICT OF MASS

05 10247 NMG

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Suffolk
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Luke T. Cadigan
SEC, 73 Tremont St., 6th Floor
Boston, MA  02108    617-573-8919

Attorneys (If Known)

John Pappalardo, Greenberg Traurig (Tambone)
617-310-6000
Warren Feldman, Clifford Chance (Hussey)
212-878-8136

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | |
|---|---|
| ☒ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgement | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☒ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination Under Equal Access to |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | or Defendant) | Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | Security Act | | |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

SEC alleges Defendants committed fraud in violation of 15 USC Sec. 78j(b), 17 CFR Sec. 240.10b-5, and 15 USC Sec 77q(a) and aided and abetted violations of 15 USC Sec's 80b-6(1), (2) and 15 USC Sec. 78o(c).

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):

JUDGE    Gorton

DOCKET NUMBER    04-10367-NMG

DATE    2/9/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)   SECURITIES AND EXCHANGE COMMISSION
    v. JAMES TAMBONE

FILED
CLERKS OFFICE

2.  CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
    COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

2005 FEB -9  A 10 20

U.S. DISTRICT COURT
DISTRICT OF MASS.

|     |      |                                                                                              |
| --- | ---- | -------------------------------------------------------------------------------------------- |
| ___ | I.   | 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.                                            |
| X   | II.  | 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. |
| ___ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
| ___ | IV.  | 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
| ___ | V.   | 150, 152, 153.                                                                               |

*Also complete AO 120 or AO 121
for patent, trademark or copyright cases

05    10247 NMG

3.  TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE
    HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

    SEC v. COLUMBIA MANAGEMENT ADVISORS, INC., Civil Action No. 04-10367-NMG

4.  HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
    COURT?

                                                                YES                    (NO)

5.  DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
    PUBLIC INTEREST?   (SEE 28 USC §2403)

                                                                YES                    (NO)

    IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?

                                                                YES                    NO

6.  IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
    28 USC §2284?

                                                                YES                    (NO)

7.  DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
    COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
    SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).

                                                                (YES)                  NO

    A.   IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

         EASTERN DIVISION              CENTRAL DIVISION              WESTERN DIVISION

    B.   IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
         GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

         EASTERN DIVISION              CENTRAL DIVISION              WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME    Luke T. Cadigan
ADDRESS    73 Tremont Street, 6th Floor, Boston, MA  02108
TELEPHONE NO.  (617) 573-8919

(Cover sheet local.wpd - 11/27/00)