UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

JAMES TAMBONE and
ROBERT HUSSEY,

      Defendants.

Civil Action No.:  05-10247 NMG

## DEFENDANT JAMES TAMBONE'S
## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### I.      INTRODUCTION

The Securities and Exchange Commission's (the "SEC" or the "Commission") Complaint is not well pled.  It is a morass of contradictory allegations and half-truths.  One could argue that it fails for lack of particularity; and that also is the truth.  However, its flaws go much deeper.  Indeed, its very lack of specificity is what gives this particular Frankenstein monster the appearance of viability when there is none in fact.  It is a collection of fragmented pieces, that, when glanced over in only cursory fashion, might appear to support a claim of wrongdoing by James Tambone.  But pull one thread and it all comes undone.  Simply stated, the Complaint does not state facts giving rise to any securities fraud claims against Mr. Tambone and, therefore, must be dismissed.

The claims against Mr. Tambone are based on the premise that the company, a broker-dealer for whom he worked as one of two co-presidents, allowed purchases and sales of mutual funds' shares by persons engaged in "market timing" activities.  Because market timing itself is

not illegal, however, to maintain a securities fraud action, the Commission must plead that Mr. Tambone made a misrepresentation to purchasers or sellers of securities, or omitted to disclose certain facts to such investors when he had a duty to speak. It utterly fails to do so. For all its bulk, the Complaint never states, and indeed applicable statutes and case law do not support, that Mr. Tambone made any material misrepresentations when he knew or recklessly should have known such statements were false. Nor do the factual allegations in the Complaint support the Commission's claim that Mr. Tambone had any duty to speak; he was Co-President of a broker-dealer that was required by law to be independent of the subject mutual funds and thus Mr. Tambone owed no fiduciary duties to them.

## II.     FACTUAL ALLEGATIONS[1]

### A.     The Commission's Claims Against James Tambone

In the Complaint, the Commission alleges Mr. Tambone knew that certain investors were allowed to "market time" in various mutual funds within the Columbia mutual fund complex ("the Columbia Funds") despite prospectus disclosures allegedly prohibiting such activity. Compl. ¶¶30-79. In particular, the Commission claims that Mr. Tambone "entered, approved or knowingly allowed at least six" market timing arrangements with one or more of the investors

---

[1] Mr. Tambone strongly objects to the inaccurate facts contained in the Complaint. Although a court must deem "well-pleaded facts" as true and view "reasonable inferences" in the opposing party's favor, a court should not credit bald assertions, legal conclusions, subjective characterizations, or otherwise unsupported factual conclusions. See e.g., Glassman v. Computervision Corp., 90 F. 3d 617, 628 (1st Cir. 1996); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); Resolution Trust Corp. v. Driscoll, 985 F.2d 44, 48 (1st Cir. 1993); Fleming v. Lind-Waldock & Co., 922 F.2d 20, 23 (1st Cir. 1990).

and his failure to disclose the alleged arrangements to the Columbia Funds' shareholders constitutes fraud.[2]  Compl. ¶¶5-6, 29.  Specifically, the Complaint alleges that:

- the Columbia Funds made disclosures in their prospectuses that indicated they could and would reject market timing when <u>Columbia Advisors</u> found it to be disruptive.

- there were occasions when the Columbia Funds' portfolio managers allowed market timing to occur.

- notwithstanding that the Commission does not allege Mr. Tambone had any authority or capacity to cause the mutual funds to allow such trading to occur, he is alleged (in the vaguest of terms) to have "approved" four market timing arrangements.

<u>See</u> <u>generally</u>, Compl.

**B.    <u>James Tambone and the Columbia Fund Complex</u>**

Mr. Tambone, along with Louis Tasiopolous (who is not named in the Complaint), was a Co-President of Columbia Funds Distributor, Inc. ("Columbia Distributor"), a Massachusetts corporation and a broker-dealer registered with the SEC.  Compl. ¶¶2, 14, 17.  Columbia Distributor is owned by Columbia Management Group.  Compl. ¶17.  Its function is to purchase and sell shares of various mutual funds pursuant to the applicable sales contracts in place with the mutual funds.  <u>See</u> <u>id.</u> (describing Columbia Distributor as "underwriter and distributor").  Columbia Distributor is not responsible for operations of the Columbia Funds.  Columbia Management Advisors, Inc. ("Columbia Advisors"), an Oregon Corporation, is the registered investment adviser to the Columbia Funds.  Compl. ¶16.  As advisor, Columbia Advisors prepared and was responsible for all representations made in the Columbia Funds' prospectuses.  Compl. ¶¶6, 16.  The Commission does not allege that Columbia Distributor was responsible for detecting and halting market timing in the Columbia Funds.  Compl. ¶17.  Rather, identifying

---

[2] The Commission inconsistently alleges Mr. Tambone "negotiated, approved or knowingly permitted arrangements with at least eight investors…."  Compl. ¶2.  A judicious reading of the Complaint, however, shows that the Commission's allegations against Mr. Tambone relate only to six investors, at most.

market timing was the responsibility of Columbia Funds Services, Inc. ("Columbia Services"), the transfer agent for the Columbia Funds. Compl. ¶18.

Mr. Tambone did <u>not</u> work for Columbia Advisors or Columbia Services. Compl. ¶¶2, 14. The Commission does <u>not</u> allege that Mr. Tambone had any responsibility for or control over the operations of Columbia Advisors or Columbia Services. <u>See generally</u>, Compl. Mr. Tambone was not a Columbia Funds' trustee.

## C.    <u>The Columbia Funds' Prospectus Disclosures</u>

The Commission highlights the following three types of prospectus disclosures contained in the Columbia Funds, but only one could possibly apply and be relevant in this case as described below:

1)    Prospectus disclosures appearing in "prospectuses for various of the Columbia Funds" from 1998 through 2000, indicated "investors would generally be permitted to make only up to four round trip exchanges per year[.]" Compl. ¶24 ("General Permission Language"). The Commission does not allege any specific misrepresentation or omission by Mr. Tambone concerning the General Permission Language.[3] <u>Id.</u>

2)    Prospectus disclosures appearing in "certain of the Columbia Funds belonging to the Acorn Fund Group" beginning in May 1999, stated that the "Acorn funds [sic] do not permit market-timing and have adopted policies to discourage this practice." Compl. ¶25 ("Market Timing Policies Language").[4]

---

[3] The only specific Columbia Funds identified in the Complaint are those of the Acorn Fund Group. Compl. ¶24. At all relevant times alleged, however, Liberty Wanger was the investment advisor to those funds. Compl. ¶17. <u>Mr. Tambone was not affiliated with or Co-President of Liberty Wanger, and Columbia Distributor did not act as broker-dealer for the Acorn Fund Group during the time periods stated in the Complaint.</u> For this reason alone, the Complaint should be dismissed.

[4] Again, the Commission identifies only the Acorn Fund Group and does not allege any specific act or omission by Mr. Tambone that was contrary to the Market Timing Policies Language. Compl. ¶25.

3)      In the Complaint, the Commission identifies the following so-called "Strict Prohibition Language" as the operative type of prospectus disclosure allegedly prohibiting market timing in the Columbia Funds during the relevant periods.[5]  Specifically, the prospectus disclosures generally provided that the subject funds do "not permit short-term or excessive trading in" their shares and, to promote the funds' best interests, the funds reserve "the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term or excessive trading or whose trading has been or may be disruptive to the Fund."   Compl. ¶¶26-27.  (emphasis supplied).   Although poorly identified in the Complaint, this language allegedly appeared in "a number of Columbia Funds belonging to Liberty" in the fall of 2000; "the rest of the Columbia Funds belonging to Liberty" by the spring of 2001; "most of the funds that had belonged to Fleet" in early 2002; and ostensibly "other funds distributed by Columbia Distributor" by the spring of 2003.  Id.

**D.      The Alleged "Market Timers"**

**1.      Illytat, L.P ("Illytat")**

Illytat is a "San Francisco hedge fund" allegedly trading in various Columbia Funds from April of 2000 to October 2003.  Compl. ¶¶30-44.  The Commission inconsistently alleges Mr. Tambone "approved or became aware" of an Illytat arrangement in one fund – the Newport Tiger Fund – at three different times:

- "by June 2000,"

- "in or before October 2000," or

- in "March 2001."

---

[5] The Commission labels this language as "Strict Prohibition Language" even though it clearly is not language of "strict prohibition" because it gives a permissive right to Columbia Advisors to accept trades it sees fit or reject particular trades the advisor finds disruptive or excessive on a discretionary basis.

Compl. ¶¶30, 32-34, 36.  The Commission alleges the Strict Prohibition Language appeared in the Newport Tiger Fund's prospectus starting "in May 2001," which <u>post-dates</u> Mr. Tambone's alleged approvals of the subject arrangement.  Compl. ¶31.  The Commission does not allege Mr. Tambone approved or became aware of any Illytat arrangement(s) in any other funds.  Compl. ¶¶39-45.

### 2.    Ritchie Capital Management, Inc. ("Ritchie Capital")

Ritchie Capital was a "hedge fund manager" allegedly trading in the Newport Tiger Fund and Columbia Growth Stock Fund ("Growth Stock Fund") from January 2000 to September 2003.[6]  Compl. ¶46.  The Commission only vaguely alleges Mr. Tambone approved a "sticky-asset" arrangement for trading in the Growth Stock Fund in "early 2003[.]"  Compl. ¶50.  The Commission does not present any facts supporting that alleged approval.  Compl. ¶¶46-51.

### 3.    Edward Stern ("Stern")

Stern seemingly was a private investor allegedly trading in the Columbia Growth & Income Fund, the Columbia Select Value Fund, and the Growth Stock Fund through "intermediaries" during "late 2002 and early 2003[.]"  Compl. ¶52.  The Commission only vaguely alleges Mr. Tambone approved an arrangement with Epic Advisors (ostensibly a Stern intermediary) to trade in those three funds in early 2003.[7]  <u>Id.</u>  The Commission does not present any facts supporting that alleged approval.  Compl. ¶¶52-54.

---

[6] The Commission does not allege Mr. Tambone approved or had knowledge of any arrangement for Ritchie Capital's trading in the Newport Tiger Fund.  Compl. ¶¶46-51.

[7] The Commission also alleges Stern traded in the Columbia High Yield Fund (ostensibly through another unnamed intermediary); however, the Commission does not allege Mr. Tambone approved or had knowledge of that arrangement.  Compl. ¶¶52-54.

### 4.      Daniel Calugar ("Calugar")

Calugar purportedly was "an investor specializing in timing mutual funds" allegedly trading in the Columbia Young Investor Fund ("Young Investor Fund"), Growth Stock Fund, and two other Columbia Funds from April 1999 to "at least August 2001." Compl. ¶¶55-60. The Commission alleges the "funds' prospectus" included the Strict Prohibition Language beginning "in early 2001." Compl. ¶60. The Commission does not allege Mr. Tambone approved any market timing arrangements with Calugar. Id.

### 5.      Sal Giacalone ("Giacalone")

Giacalone was a stock broker allegedly trading in the Newport Tiger Fund in "late 2000" to "April 2001." Compl. ¶¶62-64. The Commission alleges Mr. Tambone "approved a 'sticky asset' arrangement" with Giacalone in "late 2000." Compl. ¶62. The Strict Prohibition Language, however, did not appear in the Newport Tiger Fund's prospectus until May 2001, which post-dates Mr. Tambone's alleged approval of the Giacalone "arrangement" and any alleged trading by Giacalone. Compl. ¶¶31, 62-64. Nonetheless, the Commission does not present any facts supporting that alleged approval. Compl. ¶¶62-64.

### 6.      D.R. Loeser ("Loeser")

Loeser was a registered investment adviser allegedly trading in the Growth Stock Fund and Young Investor Fund from late 1998 to mid-2000. Compl. ¶¶66-67. The Commission alleges the funds' prospectuses included the Strict Prohibition Language beginning "in early 2001," which post-dates any alleged trading by Loeser. Compl. ¶¶55, 60, 67. Nonetheless, the Commission does not allege that Mr. Tambone approved any market timing arrangements with Loeser. Compl. ¶¶66-67.

7.      **Signalert and Tandem Financial ("Tandem")**

Signalert was an investment adviser allegedly trading in various Columbia Funds from 1999 to February 2003.  Compl. ¶¶69-73.  Tandem was an investment adviser allegedly trading in the Tax Exempt Fund from "early 2000" to September 2003.  Compl. ¶¶75-77.  The Commission does not allege Mr. Tambone knew of or approved any market timing arrangements with Signalert or Tandem.  Compl. ¶¶69-79.

III.    DISCUSSION

A.      THE COMPLAINT FAILS TO IDENTIFY A SPECIFIC MISSTATEMENT OR OMISSION BY MR. TAMBONE WHEN HE HAD A DUTY TO SPEAK

The Commission cannot state a claim under Section 10(b), Rule 10b-5, or Section 17(a) without pleading with particularity that Mr. Tambone made an affirmative misrepresentation to the Columbia Funds' shareholders.  No allegations of affirmative misrepresentation by Mr. Tambone, however, are presented in the Complaint.  Indeed, the Commission does not allege in the Complaint that any of Mr. Tambone's statements or conduct contemporaneously contradicted any Columbia Funds' prospectus disclosures with respect to any trading by (1) Illytat, (2) Calugar, (3) Giacalone, (4) Loeser, (5) Signalert, or (6) Tandem.  Rather, the so-called "doctrinal allegations" of the Complaint merely show that Mr. Tambone received a few vague e-mails or other communications about alleged market timing transactions during periods of time when the applicable Columbia Funds' disclosure language was not that of the alleged "Strict Prohibition Language" variety.  Specifically, the Commission focuses predominantly on Mr. Tambone's

conduct <u>pre-dating</u> prospectus disclosures allegedly prohibiting market timing, as shown by the chart below:

| Conduct[8] | Date Alleged[9] | Inclusion of Strict Prohibition Language[10] |
|---|---|---|
| Approval or awareness of Illytat "arrangement" (Compl. ¶¶30, 32, 33) | **October 2000 or before** | May 2001 |
| Receipt of an e-mail re: Illytat (Compl. ¶34) | **October 2000** | May 2001 |
| Receipt of an e-mail re: Illytat (Compl. ¶36) | **March 2001** | May 2001 |
| Receipt of an e-mail re: Calugar (Compl. ¶57, 80(a)) | **Beginning of 2000; spring of 2000** | "early 2001" |
| Approval of Giacalone arrangement (Compl. ¶62) | **Late 2000** | May 2001 |
| Receipt of an e-mail re: Loeser (Compl. ¶67) | **February 2000** | "early 2001" |

In contrast to the above-allegations that <u>pre-date</u> inclusion, there are only two instances where the Commission alleges Mr. Tambone took any action <u>after</u> <u>institution</u> of the so-called "Strict Prohibition Language": Mr. Tambone allegedly approved trading by Ritchie Capital and Stern in early 2003. Compl. ¶¶50, 52. While in no way conceding that the mere allegation of approval of a legal activity (as market timing is not illegal <u>per se</u>) could form the basis of a claim as a matter

---

[8] The Commission may not base the Complaint on alleged conduct that was lawful at the time it occurred. <u>See</u> <u>Upton v. SEC</u>, 75 F.3d 92, 98 (2d Cir. 1996) (allowing the SEC to sanction a defendant absent fair notice that the conduct would be deemed a regulatory violation is abhorrent to all notions of due process). The reason for that rule, of course, is that due process requires that "laws give the person or ordinary intelligence a reasonable opportunity to know what is prohibited." <u>Id.</u>

[9] The Commission filed the Complaint on February 9, 2005. The Commission may not rely on any conduct pre-dating the applicable statute of limitations with respect to any claims against Mr. Tambone.

[10] With limited exception, the Commission relies on the Strict Prohibition Language as the basis for Mr. Tambone's alleged fraud. <u>See</u> <u>e.g.</u>, Compl. ¶¶31 (Illytat), 47 (Ritchie Capital), 52 (Stern), 60 (Calugar), 72 (Signalert), 76 (Tandem). In some instances, the Commission seemingly anchors Mr. Tambone's alleged fraud on prospectus disclosures indicating that short-term trading could cause harm to a fund or create additional costs borne by all shareholders. <u>See</u> <u>e.g.</u>, Compl. ¶¶ 31 (Illytat), 47 (Ritchie Capital), 63 (Giacalone). In one instance, the Commission does not rely on <u>any</u> prospectus language. <u>See</u> Compl. ¶¶66-68 (Loeser). The "harm" disclosure cannot, as a matter of fact, support a fraud claim because the disclosure actually warns investors of the risks of purchasing shares of the fund, <u>e.g.</u>, increased costs to the extent there are short-term trades in the fund's shares.

of law, those allegations also fail for want of particularity because, beyond two short and conclusory sentences, no predicate facts are presented as to those alleged events. Such thin pleading cannot sustain a cause of action for fraud.[11]

Furthermore, allegations about mere silence are not enough to state claims of fraud against Mr. Tambone as a matter of law because the Commission does not allege that he owed any fiduciary duty to the Columbia Funds' shareholders. See generally, Compl. In most circumstances, and specifically those alleged in the Complaint, silence, absent a duty to disclose facts or information, is not misleading and does not constitute fraud under the federal securities laws. See e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988); Chiarella v. United States, 445 U.S. 222, 235 (1980); Backman v. Polaroid Corp., 1990 WL 3832, *5 (1st Cir. 1990).

The Commission does not allege that the transactions between Columbia Distributor and the Columbia Funds were anything other than arm's-length business transactions pursuant to contract. See generally, Compl. A duty to disclose specific facts or information does not arise in the normal course of an arm's-length business transaction. See Lehman Bros. Commercial Corp. v. Minmetals Intern. Non-Ferrous Metals Trading Co., 179 F. Supp. 2d 118, 150 (S.D.N.Y. 2000); Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co., 785 F. Supp. 411, 426 (S.D.N.Y. 1992). Instead, a duty to disclose facts and information requires a

---

[11] Federal pleading requirements are not toothless dragons; but rather, they mandate a party to support affirmatively each general allegation and legal theory with specific facts. See Glassman v. Computervision Corp., 90 F. 3d 617, 628 (1st Cir. 1996); Roth v. United States, 952 F.2d 611, 613 (1st Cir. 1991). Omitted facts that would "clearly dominate" the case are deemed not to exist. See O'Brien v. DiGrazia, 544 F.2d 543, 546 n.3 (1st Cir. 1976). Also, the Complaint must plead securities fraud with particularity. See FED. R. CIV. P. 9(b); Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996). The First Circuit is "especially rigorous" in enforcing Rule 9(b) in a securities fraud context. See e.g.; Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998); Gross, 93 F.3d at 991; Orton v. Parametric Technology Corp., 344 F. Supp. 2d 290, 298-99 (D. Mass. 2004). As such, the Commission must specify "the time, place and content of *each* alleged false representation" to satisfy Rule 9(b). See Bio-Vita, LTD v. Rausch, 759 F. Supp. 33, 37 (D. Mass. 1991) (emphasis supplied); see also, Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991). General and conclusory fraud allegations do not satisfy Rule 9(b). See Bio-Vita, LTD, 759 F. Supp. at 37-38. Also, a complaint may not plead so-called "fraud by hindsight," *i.e.*, "a general averment that the defendants 'knew' earlier what later turned out badly." See Suna v. Bailey Corp., 107 F.3d 64, 71 (1st Cir. 1997); Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992). As described herein, Commission's allegations in the Complaint do not satisfy these pleadings standards.

fiduciary or similar relationship of trust and confidence.  See Backman v. Polaroid Corp., 910 F.2d 10, 16-17 (1st Cir. 1990); Austin v. Bradley, Barry & Tarlow, P.C., 836 F. Supp. 36, 39 (D. Mass. 1993).  Mr. Tambone's status as Co-President of Columbia Distributor does not entail that type of relationship with the Columbia Funds because no fiduciary or similar relationship of trust arises on the basis of "one's status" as a broker-dealer to independent investors.  See Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc., 800 F.2d 177, 182 (7th Cir. 1986); Moss v. Morgan Stanley Inc., 719 F.2d 5, 15 (2d Cir. 1983); see also, Press v. Chem. Invest. Srvs. Corp., 166 F.3d 529, 536 (2d Cir. 1999) (explaining that "in the context of an ordinary broker-client relationship, the broker owes no fiduciary duty to the purchaser of the security").  Accordingly, the Commission must base its securities fraud claims against Mr. Tambone on specific, affirmative, misrepresentations to the Columbia Funds' shareholders, rather than his alleged silence.  The Commission has failed to do so and its claims should therefore be denied.

**B.     THE COMPLAINT FAILS TO PLEAD SCIENTER ADEQUATELY**

Categorically, to state a claim under Section 10(b), Rule 10b-5, and Section 17(a)(1), the Commission must plead facts supporting a strong inference that Mr. Tambone acted with "a mental state embracing intent to deceive, manipulate, or defraud[,]" i.e., that he acted with "scienter".  See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002); see also, Aaron v. SEC, 446 U.S. 680, 691-97 (1980); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976). To plead scienter properly, the Commission must present sufficient facts to establish that Mr. Tambone "consciously intended to defraud" or acted with "a high degree" of recklessness.  See Aldridge, 284 F.3d at 82.  The Commission, however, fails to allege any facts supporting a strong inference of scienter.  At best (and then not even), the Commission presents facts creating

an inference (albeit a failing one) that Mr. Tambone had the motive and opportunity to commit fraud[12] and that he must have known about the fraud based on his position as Co-President of Columbia Distributor and receipt of a few vague, sporadic e-mails or other communications.[13]

The Complaint's bald, unadorned facts are insufficient to create the required strong inference that Mr. Tambone acted with scienter.  When analyzing whether scienter is pled properly, a court should follow a "case by case fact-specific approach" and, notwithstanding the nature of the specific facts relied on, a pleading party must state with particularity facts giving rise to a "strong inference of scienter" to survive a motion to dismiss.  See e.g., Aldridge, 284 F.3d at 82; Greebel v. FTP Software, Inc., 194 F.3d 185, 196-97 (1st Cir. 1999); SEC v. Druffner, 2005 WL 225585, *5 (D. Mass., Jan. 5, 2005); Meyer v. Biopure Corp., 221 F. Supp. 2d 195, 204 (D. Mass. 2002); FED. R. CIV. P. 9(b).  Although there is no specific test on which to test a strong inference of scienter, the First Circuit has explained that allegations a defendant "had the motive and opportunity to make false and misleading statements" generally are insufficient to create the requisite inference.  See Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001); Greebel, 194 F.3d at 197.  Facts creating an inference that a defendant "must have known" about the alleged fraud likewise are insufficient.  See Maldanado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998); Orton v. Parameteric Tech. Corp., 344 F. Supp. 2d 290, 306 (D. Mass. 2004).  Rather, a pleading party must allege "some additional misconduct" to support the required inference of scienter.  See Geffon, 249 F.3d at 36.  As the First Circuit highlighted in Geffon:

> Evidence we have found relevant to the scienter issue includes:  insider trading in
> conjunction with false and misleading statements; a divergence between internal

---

[12] See Compl. ¶¶ 4 (alleging "arrangements benefited" Mr. Tambone because his compensation depended upon sales), 21 (reviewing Mr. Tambone's compensation), 84 (inferring Mr. Tambone's motivations related to compensation).

[13] See supra, p. 9 (chart highlighting receipt of e-mails and other communications), Compl. ¶¶2,14, 17 (describing Mr. Tambone's position with Columbia Distributor).

> reports and public statements; disclosure of inconsistent information shortly after
> the making of a fraudulent statement or omission; bribery by top company
> officials; evidence of an ancillary lawsuit, charging fraud, which was quickly
> settled; disregard of current factual information acquired prior to the statement at
> issue; accounting shenanigans; and evidence of actions taken solely out of self-
> interest.

See Geffon, 249 F.3d at 36; Greebel, 194 F.3d at 196 (and cases cited therein). Moreover,

pleading scienter based on reckless conduct requires "a highly unreasonable omission, involving

not merely simple, or even inexcusable negligence, but an extreme departure from the standards

of ordinary care" that "comes closer to being a lesser form of intent than merely a greater degree

of ordinary negligence." See SEC v. Fife, 311 F.3d 1, 9-10 (1st Cir. 2002); Geffon, 249 F.2d at

35; Cook v. Avien, Inc., 573 F.2d 685, 692 (1st Cir. 1978). Such "additional misconduct" is not

present in the Complaint. Accordingly, this Court should dismiss all of the Commission's

scienter-based claims.

## C.    THE COMPLAINT FAILS TO STATE ANY AIDING AND ABETTING CLAIMS UNDER THE ADVISERS ACT OR SECTION 15(a)[14]

In addition to demonstrating a primary violation, to state an aiding and abetting claim

under the Advisers Act and Section 15(a) properly, the Commission must plead with particularity

that the alleged aider and abettor (1) was aware or knew that his actions were part of an overall

improper or illegal course of conduct and (2) substantially assisted that course of conduct. See

Monetta Financial Services, Inc. v. SEC, 390 F.3d 952, 957 (7th Cir. 2004); Armstrong v.

McAlpin, 699 F.2d 79, 91 (2d Cir. 1983); SEC v. Steadman, 967 F.2d 636, 647 (D.C.Cir.

1992).[15] In addition, an aiding and abetting securities fraud claim, like a primary claim, requires

---

[14] Aiding and abetting allegations resting on securities fraud must also satisfy Rule 9(b). See Kilmartin v. H.C. Wainwright & Co., 637 F. Supp. 938, 941-42 (D. Mass. 1986); ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F. Supp. 1308, 1328 (S.D.N.Y. 1997).

[15] The elements essentially are the same as a Section §10(b) or Rule 10b-5 aider and abettor claim. See Cleary v. Perfectune, Inc., 700 F.2d 774, 777 (1st Cir. 1983), overruled on other grounds, Central Bank of Denver v. First

a showing of scienter.  See Cleary v. Perfectune, Inc., 700 F.2d 774, 779-80 (1st Cir. 1983), overruled on other grounds, Central Bank of Denver v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994); see also, supra, pp. 11-13 (analyzing scienter in securities fraud cases).[16] None of these elements are present here.

Furthermore, despite the Commission's reliance, a defendant's silence or inaction cannot constitute knowing and substantial assistance unless (1) the defendant "recklessly violates" a duty to disclose or (2) in the absence of a duty, the silence was consciously intended "to further the principal violation."  See Cleary, 700 F.2d at 778; Austin, 836 F. Supp. at 39 & n.3. "Conscious intent" may be inferred from facts showing that the defendant (1) threw "in his lot with the primary violators" and (2) "benefited" from the alleged silence.  See Austin, 836 F. Supp. at 39-40; National Union Fire Ins. Co. v. Turtur, 892 F.2d 199, 207 (2d Cir. 1989).  A court should be "particularly exacting" in determining conscious intent and cognizant that "economic motivation alone is too remote and minimal" to support such a finding.  See Austin, 836 F. Supp. at 40; DiLeo v. Ernst & Young, 901 F.2d 624, 629-30 (7th Cir. 1990); National Union Fire Ins. Co., 892 F.2d at 207.

Much like the Commission's primary fraud claims against Mr. Tambone, and notwithstanding the nineteen (19) pages of irrelevant facts contained in the Complaint (most of which do not concern Mr. Tambone), the Commission fails to present any facts – other than conclusory statements and innuendos – supporting a reasonable inference that Mr. Tambone substantially assisted Columbia Advisors or Columbia Distributor in their uncharged, primary

---

Interstate Bank of Denver, N.A., 511 U.S. 164 (1994); see also, SEC v. Peretz, 317 F. Supp. 2d 58, 63 (D. Mass. 2004).

[16] More specifically, in the absence of a duty to disclose, a defendant should not "be held liable as an aider and abettor" unless the plaintiff "proves that the defendant had actual knowledge of the improper activity of the primary violator and of his role in that activity."  Cleary, 700 F.2d at 777 (emphasis supplied).  In the face of a duty to disclose, the plaintiff must still prove "recklessness[.]"  Id.; Howard v. SEC, 376 F.3d 1136, 1143 (D.C.Cir. 2004) ("It is not enough that the accused aider and abettor's action or omission is derived from inexcusable neglect").

securities fraud violations.  In particular, the Commission fails to allege any facts supporting the proposition that Mr. Tambone had "actual knowledge" of the primary violators' allegedly improper activities, especially considering the contravening facts <u>in the Complaint</u> showing that Mr. Tambone's alleged knowledge of those activities came at times when the relevant prospectuses did not prohibit market timing.  In addition, the Commission proffers no facts supporting any inference that Mr. Tambone actually knew he had any "role" in the allegedly improper activities other than his alleged silence or failure to act.

Rather, the Commission highlights the acts and assistance of individuals <u>other than Mr. Tambone</u>.  <u>See</u> <u>Compl.</u>, ¶¶ 30, 32, 34, 37, 41 (Illytat); 48, 50 (Ritchie Capital); 53 (Stern); 55-57, 60 (Calugar); 64 (Giacalone); 66-68 (Loeser); 69-74 (Signalert); 77-79 (Tandem).  Surprisingly, the Commission actually acknowledges <u>in the Complaint</u> that Mr. Tambone tried to monitor "known timers" and "catch what they can."  <u>See</u> Comp. ¶82.  The inference arising from those facts is that others were engaged in improper activities and Mr. Tambone attempted to stop those activities to the extent he was able.  Much like the difficulties with the Commission's scienter claims, even if the facts somehow infer inexcusable neglect, it cannot reasonably be inferred that Mr. Tambone was reckless or threw "in his lot" with the alleged primary violators or that he benefited from his alleged silence.  The Commission's allegations and attendant inferences concerning economic motivation are insufficient to support substantial assistance and, therefore, the Commissions' aiding and abetting claims should be dismissed.

## IV.     CONCLUSION

For the foregoing reasons, this Court should grant Mr. Tambone's Motion to Dismiss.

JAMES TAMBONE,

By his attorneys,

/s/ David G. Thomas
A. John Pappalardo (BBO #388760)
John A. Sten (BBO #629577)
Gina Dines Holness (BBO #557714)
David G. Thomas (BBO# 640854)
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA  02110
(617) 310-6000

Dated:  April 15, 2005

16