UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
SECURITIES AND EXCHANGE COMMISSION,                 )
                                                    )
                    Plaintiff,                      )
                                                    )
          v.                                        )    Civil Action No.
                                                    )    05-10247-NMG
JAMES TAMBONE and                                   )
ROBERT HUSSEY,                                       )
                                                    )
                    Defendants.                     )
_____)

## SEC'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC") hereby opposes the motions to dismiss filed by Defendants James Tambone ("Tambone") and Robert Hussey ("Hussey"). Because the SEC has pled each of its claims against Defendants with more than sufficient particularity, Defendants' motions should be denied.

## SUMMARY

In its Complaint, the SEC alleges that Defendants were senior executives at Columbia Funds Distributor, Inc. ("Columbia Distributor"), a broker-dealer registered with the SEC. *See* Complaint, at ¶17. Columbia Distributor served as the principal underwriter and distributor of over 140 of the mutual funds in the Columbia mutual fund complex (the "Columbia Funds"), and in that capacity, disseminated prospectuses for the Columbia Funds. *See id.* Tambone, as Columbia Distributor's Co-President, and Hussey, as its Senior Vice President and Managing Director for National Accounts, had responsibility for selling the Columbia Funds to clients and potential clients. *See id.* at ¶¶

1, 17, 19, 20.  From as early as 1998 and continuing through September 2003, Defendants

entered into, approved, and knowingly permitted arrangements allowing certain preferred

customers (the "Preferred Customers") to engage in short-term or excessive trading in at

least sixteen different Columbia Funds.  *Id.* at ¶ 3.  Despite their participation in and

knowledge of these arrangements and their awareness of other short-term or excessive

trading by the Preferred Customers, Defendants made sales and offers of the Columbia

Funds to investors using prospectuses that represented that such trading was prohibited or

that made other statements indicating a hostility towards such practices.  *See id.* at ¶¶ 2,

3, 6, 19, 20, 24, 25, 26, 27.  Defendants also made material omissions insofar as they

never disclosed these arrangements to investors when selling them the Columbia Funds.

*See id.* at ¶¶ 45, 51, 54, 61, 65, 68, 74, 78.

## ARGUMENT

### I.     The Standard for Deciding a Motion to Dismiss

In ruling on Defendants' motions to dismiss, the Court must accept as true all

factual allegations in the Complaint and must draw all reasonable inferences from those

allegations in the SEC's favor.  *See TAG/ICIB Servs., Inc. v. Pan American Grain Co.*,

215 F.3d 172, 175 (1st Cir. 2000); *SEC v. Druffner*, 353 F. Supp.2d 141, 147 (D. Mass

2005) (Gorton, J.); *see also North Bridge Assocs., Inc. v. Boldt,* 274 F.3d 38, 40 (1st Cir.

2001) (when considering a motion to dismiss, the court must "indulge every reasonable

inference in favor of allowing the lawsuit to proceed").  Dismissal is appropriate "only if

it is clear that no relief could be granted under any set of facts that could be proved

consistent with the allegations."  *Estate of Soler v. Rodriguez*, 63 F.3d 45, 53 (1st Cir.

1995).  If the facts in the Complaint are sufficient to state a cause of action, the motions

to dismiss the complaint must be denied.  *See Druffner,* 353 F. Supp.2d at 147.  Applying

this standard, the Court should deny Defendants' motions.

## II.    __The Complaint Alleges a Claim of Fraud with Particularity__

### A.    __Pleading Fraud under Rule 9(b)__

In its Complaint, the SEC alleges that Defendants engaged in fraud in violation of

Section 17(a) of the Securities Act of 1933 (the "Securities Act"),[1] Section 10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act")[2] and Rule 10b-5 thereunder.[3]  The

SEC has also alleged that Defendants aided and abetted Columbia Management Advisors,

Inc.'s ("Columbia Advisors") violations of Sections 206(1) and (2) of the Investment

Advisers Act of 1940 ("Advisers Act")[4] and Columbia Distributor's violations of Section

---

[1] Section 17(a) of the Securities Act makes it unlawful for any person, in the offer or sale of any securities, directly or indirectly:

    (1)      to employ any device, scheme, or artifice to defraud; or

    (2)      to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (3)      to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

[2] Section 10(b) of the Exchange Act makes it unlawful for any person, directly or indirectly, "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" rules promulgated by the SEC.  15 U.S.C. § 78j(b).

[3] Rule 10b-5 makes it unlawful for any person:

    (a)      to employ any device, scheme, or artifice to defraud;

    (b)      to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)      to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5.

[4] Sections 206(1) and (2) of the Advisers Act provide that it shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--

    (1)      to employ any device, scheme, or artifice to defraud any client or prospective client; [or]

    (2)      to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . .

15 U.S.C. § 80b-6(1) and (2).

15(c) of the Exchange Act.[5]  Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Because the SEC's allegations rest primarily on fraud, the Complaint must satisfy the requirements of Rule 9(b).  *See Druffner,* 353 F. Supp.2d at 148.

Courts in the First Circuit interpret Rule 9(b) to require that the complaint allege the "time, place, and content of the alleged misrepresentations with specificity."  *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999); *Druffner,* 353 F. Supp.2d at 148.  Thus, the Complaint must specify:  (1) the allegedly fraudulent statements or omissions; (2) the identity of the speaker; (3) where and when the statements or omissions were made; and (4) why the statements or omissions were fraudulent.  *See Druffner,* 353 F. Supp.2d at 148 (citing *In re Allaire Corp. Sec. Litig.*, 224 F. Supp.2d 319, 325 (D. Mass. 2002)).  At the same time, however, these requirements must be read in conjunction with Fed. R. Civ. P. 8, which sets forth the general rules of pleading and which requires that a complaint contain only "a short and plain statement of the claim" and that each averment be "simple, concise and direct."  *See McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 229 (1st Cir. 1980); *U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp.2d 39, 46-47 (D. Mass. 2001).  For that reason, Rule 9(b) does not require a claimant to set out in detail each and every fact upon

---

[5] Section 15(c)(1)(A) of the Exchange Act provides:
No broker or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security . . . otherwise than on a national securities exchange of which it is a member, . . . by means of any manipulative, deceptive, or other fraudulent device or contrivance.
15 U.S.C. § 78o(c )(1)(A).

which he bases his claim, or to plead evidentiary matters. *Franklin,* 147 F. Supp.2d at 46-47; *see also In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001) ("[e]ven with the heightened pleading standard under Rule 9(b) . . . , we do not require the pleading of detailed evidentiary matter in securities litigation"). In addition, when information giving rise to securities fraud is exclusively held by defendants, the particularity requirement of Rule 9(b) is relaxed. *Druffner*, 353 F. Supp. 2d at 149. Rule 9(b) exists to serve the important policy interest of providing adequate notice to the defendant of the grounds on which the plaintiff's fraud claim rests. *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985); *Wayne Inv., Inc. v. Gulf Oil Corp.*, 739 F.2d 11, 13 (1st Cir. 1985).

### B.    Defendants' Material Misrepresentations

As a primary matter, the SEC alleges that Defendants made material misrepresentations to investors. More specifically, the SEC alleges that Defendants were responsible for selling the Columbia Funds to clients and potential clients and that in making such sales, Defendants used prospectuses for the Columbia Funds that were issued by Columbia Distributor. *See id.* at ¶¶ 6, 17, 19, 20. As the Complaint makes clear, these prospectuses contained material misrepresentations concerning the policy on short-term or excessive trading in the respective Columbia Funds and the efforts to limit, if not prohibit, such activity. These representations were directly contrary to trading engaged in by the Preferred Customers, who had entered into arrangements that Defendants had negotiated, approved, or knowingly permitted.

In *SEC v. PIMCO Advisors Fund Management LLC (*"*PIMCO*"*)*, the court found that certain disclosures concerning market timing could constitute misrepresentations

because "they gave the clear impression to investors that the PIMCO Funds were hostile to market timing activities and intended for use by long-term investors at the same time that PIMCO was negotiating and maintaining a market timing relationship with Canary [a customer]."   341 F. Supp.2d 454, 464 (S.D.N.Y. 2004).[6]  The court rejected defendants' arguments that because the disclosures did not formally prohibit market timing under all circumstances, they were not misrepresentations and the claims should be dismissed.  The court reasoned that "even if the Canary arrangement was not strictly prohibited by the alleged disclosures, the disclosures were clearly misleading because they informed investors that the management of the PIMCO Funds would act to protect the interests of long-term investors from market-timers at the same time that the Funds were, under the direction of [defendants], allegedly facilitating an undisclosed market timing arrangement."  *Id.*  The court concluded that "[b]ecause the disclosures here could easily be read by a factfinder to strictly limit market timing, and because the Canary arrangement was so out of keeping with the PIMCO's Funds' policy against market timing, dismissal of the SEC's misrepresentation claim is inappropriate at this stage of the proceedings."  *Id*.

Here, the SEC alleges that the fund prospectuses used by Defendants for sales purposes contained misrepresentations that, as in *PIMCO*, gave the clear impression that the Columbia Funds were hostile to market timing activities at the same time that Defendants were negotiating, approving, or knowingly permitting short-term or excessive trading relationships with the Preferred Customers.  In the Complaint, the SEC specifically identifies those fund prospectuses that contained misrepresentations and

---

[6] As Hussey himself points out in his motion to dismiss, *PIMCO* involved a "substantially identical context."  Memorandum of Law in Support of Defendant Robert Hussey's Motion to Dismiss the Complaint ("Hussey Mem."), at 8.

identifies what those misrepresentations were. *See also Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) ("[r]eference to the Offering Memorandum satisfies [Rule] 9(b)'s requirements as to identification of the time, place, and content of the alleged misrepresentations. Furthermore, no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where . . . defendants are insiders or affiliates participating in the offer of the securities in question.").

For example, the Complaint alleges that despite the fact that the Preferred Customers were allowed to engage in short-term or excessive trading in the Columbia Funds, many of the prospectuses for these funds (each of which is specifically identified in the Complaint) nonetheless included the Strict Prohibition language stating "The Fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses."[7] The Complaint also alleges that even prior to the adoption of the Strict Prohibition language, certain of the prospectuses (each of which is specifically identified in the Complaint) were affirmatively misleading insofar as they contained other language stating that market timing would not be permitted,[8] or generally limiting investors to

---

[7] *See* Complaint, at ¶¶ 31, 38, 47 (Newport Tiger Fund); *id.* at ¶ 39 (Acorn International Fund); *id.* at ¶ 42 (Acorn International Select Fund); *id.* at ¶¶ 50, 52, 72 (Growth Stock Fund); *id.* at ¶ 52 (Columbia Growth & Income Fund); *id.* at ¶ 52 (Columbia Select Value Fund); *id.* at ¶ 53 (Columbia High Yield Fund); *id.* at ¶ 72 (Columbia Young Investor Fund); *id.* at ¶ 73 (Stein Roe Income Fund); *id.* (Acorn Fund); *id.* at ¶ 76 (Tax Exempt Fund). Because the Complaint identifies, for each fund in which the Preferred Customers traded, exactly what misleading disclosures, if any, were included in the respective prospectuses during the periods that the Preferred Customers engaged in short-term or excessive trading, Hussey's assertion that "the Commission makes allegations in generalities and by example, without identifying the particular fund or prospectus responsible for the disclosures" is without basis. *See* Hussey Mem., at 15.

[8] *See id.* at ¶ 39 (Acorn International Fund); *id.* at ¶ 43 (Acorn Foreign Forty Fund); *see also id.* at ¶¶ 31, 47, 63 (noting that prior to the adoption of the Strict Prohibition, the Newport Tiger Fund prospectus stated "[s]hort-term >market timers' who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders.").

three-to-four trades per year.[9]  For each of the prospectuses, the Complaint alleges when

the misleading language was in effect.  *See id.* at ¶¶ 24, 25, 26, 31, 39, 40, 42, 43, 47, 49,

50, 52, 53, 60, 63, 72, 73, 76.[10]

    The Complaint also identifies the eight Preferred Customers with market timing

arrangements that were negotiated, approved or knowingly permitted by Defendants, the

nature of those arrangements, Defendants' respective roles in those arrangements, and the

timeframe those arrangements were entered into.  *See id.* at ¶¶ 30, 32, 48, 49, 50, 52, 53,

55, 62, 66, 69, 70, 75.  In addition, to highlight the misleading nature of the disclosures

regarding short-term or excessive trading, the SEC has detailed the trading activity of the

Preferred Customers in each of the affected funds.[11]  *See also Druffner,* 353 F. Supp.2d at

148 (finding requirements of Rule 9(b) met where complaint alleged, *inter alia*, the seven

principal clients for whom market timing trades were processed and their trading

activity).  In short, the Complaint sets forth Defendants' misrepresentations with

particularity.

    **C.    Defendants' Material Omissions**

    Section 17(a)(2) of the Securities Act and Rule 10b-5(b) under the Exchange Act

provide that, when making statements, a speaker must not omit "to state a material fact

---

[9] *See id.* at ¶ 73 (Galaxy Equity Value Fund; generally limiting investors to three exchanges per year); *id.* (Galaxy Growth & Income Fund; generally limiting investors to three exchanges per year); *id.* at ¶ 43 (Acorn Foreign Forty Fund; restricting investors to four trades per year); *id.* at ¶ 39 (Acorn International Fund; restricting investors to four round trips per year).

[10] Hussey makes much of the fact that the Preferred Customers also traded in funds (pursuant to arrangements or otherwise) as to which the SEC has not alleged any particular fraudulent statement in the prospectus.  *See* Hussey Mem., at 7, 15.  However, in each of those discrete instances, the SEC is not alleging an affirmative misrepresentation, but a material omission.  *See* Part II(C), *infra.*

[11] *See id.* at ¶¶ 30, 32, 38, 39, 40, 42, 43, 44 (Ilytat); *id.* at 47, 49, 50; *id.* at ¶ 53 (Stern); *id.* at ¶¶ 58, 59 (Calugar); *id.* at ¶ 63 (Giacalone); *id.* at ¶ 67 (D.L.Loeser); *id.* at ¶¶ 71, 72, 73 (Signalert); *id.* at ¶¶ 75, 76 (Tandem);

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Therefore, "[t]he securities laws give rise to a duty to disclose any information necessary to make an individual's voluntary statements not misleading." *Druffner,* 353 F. Supp.2d at 148 (citing Rule 10b-5(b)); *see also, e.g.*, *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (when revealing one fact, a speaker must reveal "such others [as] are needed so that what was revealed would not be so incomplete as to mislead"); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (when a speaker makes a disclosure, whether voluntary or required, "there is a duty to make it complete and accurate").

The failure to disclose a market timing arrangement may be considered a material omission. *See PIMCO*, 341 F. Supp.2d at 464. As the *PIMCO* court stated, "[d]isclosure of the arrangement, with its potential detrimental impact on investors in several mutual funds affected by the market timing practices, could easily have affected a reasonable long-term investor's decision to invest in one of the funds that [was] aggressively market-timed." *Id.* The duty to disclose such an arrangement is particularly acute where, as here, the funds have made or are making blanket statements indicating their hostility to market timing practices. *Id.*

Here, the SEC alleges that Defendants never "disclosed to the long-term or prospective shareholders of the Columbia Funds . . . the special arrangements they made with these short-term or excessive traders and the potential harm these arrangements posed to the relevant Columbia Funds." Complaint, ¶ 5; *see also id.* at ¶ 45, 51, 54, 61, 65, 68, 74. The SEC has also alleged that Defendants did not disclose the resulting conflicts of interest these arrangements created between Columbia Advisors and its

clients, nor did they disclose the conflicts of interest created by the disparate treatment of investors in the same fund, which was a result of these arrangements. *See id.* at ¶ 5; *see also id.* at ¶ 45, 51, 54, 61, 65, 68, 74.

Defendants were responsible for selling the Columbia Funds to investors and potential investors. In making these sales, and particularly when they used the prospectuses of the Columbia Funds to do so, Defendants assumed a duty to disclose to investors the existence of the short-term or excessive trading arrangements. Given the language in the prospectuses suggesting a hostility to market timing, it is clear that Defendants had an obligation to disclose the existence of the arrangements that made those disclosures misleading.

However, it is equally clear that even prior to the adoption of the market timing disclosures in the prospectuses and even in the absence of any language prohibiting market timing, Defendants had an obligation to disclose to investors the existence of those arrangements. *See Druffner,* 353 F. Supp.2d at 148; *PIMCO*, 341 F. Supp.2d at 464-65. The fact that the arrangements may not have expressly violated any provisions set forth in the prospectus of any individual fund does not make the omissions any less actionable. Indeed, as this Court found in *Druffner*, "the securities laws do not require that a violation of Section 10(b) or Rule 10b-5 must involve a violation of the provisions of the prospectus of a particular fund. The plain language of those provisions proscribes fraudulent devices or statements without limiting their reach to the kinds of statements that are prohibited in a prospectus." 353 F. Supp.2d at 148.

Hussey suggests that he cannot be held liable because the Complaint does not allege that he played any role in the preparation, drafting or signing of the misleading

prospectuses.  Hussey Mem., at 8-9.  In support of this proposition, Hussey cites to the *PIMCO* court's dismissal of a claim against Kenneth Cobra, the CEO of the investment adviser to the PIMCO Funds and portfolio manager for two PIMCO funds.  *See id.* at 8.  However, the *PIMCO* court's decision with respect to Cobra is distinguishable because there, the complaint failed to allege that Cobra personally drafted the misleading statements *or communicated* them to investors.[12]  By contrast, in this matter, the SEC alleges that Defendants, who were responsible for selling the funds, made material misstatements and omissions insofar as they "used [the misleading fund prospectuses] in offering and selling the funds directly or indirectly to clients and potential clients."  Complaint, at ¶¶ 6, 19, 20.  Accordingly, the Complaint sufficiently alleges that by their communication and dissemination of the misleading prospectuses to investors, Defendants made material misrepresentations and omissions.  *See In re Rexplore, Inc. Sec. Litig.,* 671 F.Supp. 679, 683 (N.D.Cal. 1987) (denying motion to dismiss as to broker, chairperson, and president where they allegedly did not draft offering memorandum, but endorsed the statements in memorandum in making sales to investors).[13]

_____

[12] *See* 341 F. Supp.2d at 467 ("the Complaint does not allege [Cobra] personally drafted *or communicated* [misleading statements to others]") (emphasis added); *id.* ("the Complaint fails to assert that [Cobra] has primary responsibility for development *or communication of* any of the misleading statements") (emphasis added); *see also id.* at 466-67 (distinguishing case where, *inter alia,* defendant "personally disseminated misleading statements").  The accountant cases cited by Hussey are similarly distinguishable insofar as there was no allegation that the accountants in those cases communicated the misrepresentations themselves.  *See, e.g., Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 2d Cir. 1998) (affirming dismissal of claim against Ernst & Young who "neither directly nor indirectly communicated misrepresentations to investors"); *In re Kendall Square Research Corp. Sec. Litig.*, 868 F. Supp. 26, 28 (D. Mass. 1994) ("Price Waterhouse did not actually engage in the reporting of the financial statements and Prospectuses").

[13] *See also Scholastic Corp. Sec. Litig.,* 252 F.3d  at 75-76 (denying motion to dismiss where executive was responsible for communications with investors and involved in, *inter alia,* drafting *and/or* dissemination of false and misleading statements); *Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 94 F. Supp.2d 491, 502 (S.D.N.Y. 2000) (finding that defendants made misrepresentations where, *inter alia,* they

D.    **Defendants' Fraudulent Scheme**

The SEC's allegations that Defendants sold the Columbia Funds to investors without telling them that Defendants had entered into, approved or knowingly allowed the Preferred Customers to engage in short-term or excessive trading in contravention of prospectus disclosures also adequately supports the SEC's actionable claim that Defendants were engaged in a fraudulent or deceptive scheme.[14]  *See In re Enron Corp. Sec., Derivative & ERISA Litigation,* 235 F.Supp.2d 549, 577 (S.D.Tex. 2002) (while Rule 10b-5(b) premises liability on misstatements and omissions, sections (a) and (c) allow suits "against defendants who, with scienter, participated in a course of business or a device, scheme or artifice that operated as a fraud on . . . purchasers of stock even if these defendants did not make a materially false or misleading statement or omission.") (internal quotations and citations omitted); *see also In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp.2d 161, 173 (D. Mass. 2003) (finding that primary liability can be imposed on person who "employ[s] a manipulative or deceptive device . . . intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market.").[15]  By their conduct, Defendants increased their

---

gave a misleading offering memorandum to investors as part of their sales pitch); *In re Everest Sec., Inc.*, 62 SEC Docket 1914, 1996 WL 487682, at *3 (Aug. 26, 1996), *aff'd in part, vacated on other grounds*, 116 F.3d 1235 (8th Cir. 1997) (finding that selling agent and provider of misleading offering memorandum violated antifraud provision where it distributed the memorandum to purchasers, even though it did not participate in memorandum's preparation).

[14] In alleging a fraudulent scheme or device, "slavish satisfaction of these judicially-fashioned elements" from affirmative misrepresentation cases is not required.  *See SEC v. U.S. Environmental, Inc.*, 82 F. Supp.2d 237, 240 (S.D.N.Y. 2000) (applying relaxed standard under Rule 9(b) for securities fraud claim for market manipulation which did not involve affirmative misrepresentations).

[15] Hussey's attempt to limit the scope of Section 10(b) solely to misstatements, omissions, and "sham transactions" contradicts the Supreme Court's pronouncement that "[s]ection 10(b) was designed as a catch-all clause to prevent fraudulent practices."  *Chiarella v. United States*, 445 U.S. 222, 226 (1980); *see also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (quoting *SEC v. Capital*

sales and compensation to the detriment of the long-term investors of the respective

funds, to whom these arrangements were never disclosed. Therefore, because the

Complaint also alleges a deceptive scheme by Defendants, their motions to dismiss

should be denied on this ground as well. *See, e.g.*, *SEC v. Zandford,* 535 U.S. 813, 820-

22 (2002) (broker's sales of customers' securities with undisclosed intent to

misappropriate the proceeds constituted fraud on customers); *SEC v. Santos,* 355 F.

Supp.2d 917, 919-20 (N.D. Ill. 2003) (denying motion to dismiss claim that city treasurer

demanded illegal payments from brokers); *but see PIMCO,* 341 F. Supp. 2d at 468-69.

## III.    __The SEC Alleges Facts Supporting a Strong Inference of Scienter__

To survive a motion to dismiss a securities fraud case in the First Circuit, the

plaintiff must allege facts which give rise to an inference of scienter that is "both

reasonable and strong." *Greebel*, 194 F.3d at 195-96 (internal quotation marks omitted);

*see also Druffner,* 353 F. Supp.2d at 149-50 (quoting same). In *PIMCO*, the court found

the requisite scienter where under the circumstances, a reasonable factfinder could

conclude that the defendant "had to have been aware of the Funds' stated policies against

market timing and orientation towards long-term investors at the time he allegedly

personally approved the agreement with Canary authorizing Canary to engage in

activities inconsistent with the Fund's disclosed market timing policies." 341 F. Supp. 2d

at 465. In the present case, the Court should find the requisite scienter for the same

reasons.

In the Complaint, the SEC alleges numerous facts from which a reasonable

factfinder could conclude that Defendants had to have been aware of the Columbia

*Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963)) (Section 10(b) should be "construed 'not
technically and restrictively, but flexibly to effectuate its remedial purposes.'").

Funds' policies against short-term or excessive trading and its orientation towards long-term investors. Defendants were executives at Columbia Distributor, the entity charged with issuing and disseminating the prospectuses for the Columbia Funds. *See* Complaint, at ¶¶ 6, 17, 19, 20. They also had responsibility for selling the funds and used the prospectuses in offering and selling the funds to clients and potential clients. *See id.* at ¶¶ 6,19, 20. As discussed above, many of these prospectuses expressly represented to investors that the funds did not permit market timing or other short-term or excessive trading because of its harmful effect on the funds. *See id.* at ¶ 6, 26. Other prospectuses represented that the funds would allow no more than three or four exchanges per fund per year. *See id.* at ¶ 6. As the Complaint alleges, Defendants knew or were reckless in not knowing of the prospectus disclosures for the Columbia Funds they sold, and they knew or were reckless in not knowing that they had to act consistently with these disclosures. *See id.* at ¶ 28.

The Complaint also alleges that Defendants made and received numerous statements which provide compelling evidence that they knew or recklessly disregarded the short-term or excessive trading engaged in by those with whom they had entered into agreements and the potential or actual harm and disruption it was causing to the respective Columbia Funds. *See also PIMCO*, 341 F. Supp. 2d at 465 (finding that defendant's statements and course of conduct "strongly indicate that he was regularly made aware of the harmful nature of Canary's trading activities, but that he nonetheless failed to either disclose the activities or put a stop to them for more than a year after the conduct began"). For example:

- In the beginning of 2000, Hussey wrote to his subordinate that Calugar's trading was "getting ridiculous. We've got to slow the Calugar boys down." Thereafter,

in another e-mail to his subordinate, he stated, "Whoa, Nellie! I think this is getting a little out of control."[16]

- In the spring of 2000, the Stein Roe International Fund's liaison to Columbia Distributor sent an e-mail to Tambone to increase his awareness of the magnitude of the market timing problem by showing him that over a six-week period, the amounts going in and out of the fund exceeded the size of the fund itself. *See id.* at ¶ 80(a).

- In October 2000, in an e-mail to Tambone and Hussey discussing Ilytat, the Newport Tiger Fund portfolio manager stated: "[T]heir active trading has increased and it has become unbearable. There will be long term damage to the fund." He further noted, "I hope wholesalers understand that by accepting a flipper's [*i.e.*, a short-term trader's] investment they do damage to the fund's performance, tax status, and the other shareholders (their clients)."[17]

- In September 2002, in a report distributed to Hussey, Columbia Fund Services, Inc. ("Columbia Services") stated that, "Despite the tools currently available to us, timers continue to disrupt fund performance and management as well as exaggerate sales figures." *Id.* at ¶ 80(b).

Notwithstanding the concerns raised about market timing generally and the impact of the trading by the Preferred Customers more specifically, Tambone and Hussey, whose compensation depended in significant part on mutual fund sales, did not take any steps, or cause others to take steps, to restrict or stop the short-term or excessive trading of the Preferred Customers. *See, e.g., id.* at ¶ 4, 21, 35, 36, 57, 60, 71*; see also Druffner,* 353 F. Supp. 2d at 151 (finding scienter where, *inter alia*, defendant failed to stop market timing activity after receiving complaints of such activity). Indeed, in response to concerns raised about the damage done by market timers, Hussey had set forth guidelines for *allowing* such short-term or excessive trading arrangements and

---

[16] Complaint, at ¶ 57; *see also id.* at ¶ 60 (Hussey informed of further Calugar trading in early 2001); *id.* at ¶ 71 (Hussey informed of Signalert trading).

[17] *Id.* at ¶ 34; *see also id.* at ¶ 36 (Newport Tiger Fund portfolio manager and his superior spoke directly to Tambone about market timing issues, including concerns about negative impact that frequent movements of large amounts of cash in and out of the fund could have, making it difficult to manage the fund)*; id.* (in e-mail to Tambone and Hussey, Newport Tiger Fund portfolio manager stated that "Newport . . . and the fund's long-term shareholders are all negatively impacted by flippers.").

copied them to Tambone. *See* Complaint, at ¶ 34. In addition, Hussey was aware the market timing surveillance manager was allowing those with timing arrangements to engage in market timing.[18] The Complaint also alleges that Defendants interfered, or knowingly allowed subordinates to interfere, with efforts to halt short-term or excessive trading.[19]

In sum, the SEC "has set forth specific facts that give rise to a reasonable, strong inference of fraudulent behavior and that is adequate to survive a motion to dismiss." *Druffner,* 353 F. Supp.2d at 149.

## IV.    The SEC Has Properly Pled its Aiding and Abetting Claims

The SEC alleges that Defendants aided and abetted violations by Columbia Advisors of Sections 206(1) and 206(2) of the Advisers Act and by Columbia Distributor of Section 15(c) of the Exchange Act. Defendants may be held liable for aiding and abetting if: (1) a primary violation was committed; (2) Defendants had a general awareness that their conduct was a part of an overall activity that was improper; and (3) Defendants are found to have knowingly and substantially assisted in the primary violation. *See Druffner,* 353 F. Supp.2d at 150; *PIMCO*, 341 F. Supp.2d at 470.

---

[18] In an e-mail forwarded to Hussey, this manager wrote "I review 3 different reports each day that reflect accounts fitting this criteria [the definition of market timers]. After these accounts are located, I take action against some of them. The accounts that are recognized as timers (that do not have some kind of existing relationship with us) merit trade cancellations and placement of account stops. The accounts that are allowed to trade (due to a sales relationship) are ignored." *Id.* at ¶ 83.

[19] *See id.* at ¶¶ 37, 83 (Hussey participated in creating a list of "Accounts Approved for Frequent Trading," against which no action was to be taken); *id.* at ¶ 41 (Hussey caused a Columbia Services manager to telephone a portfolio assistant to tell her that it was "inappropriate" for her to take any direct steps to halt Ilytat's trading); *id.* at ¶ 41 (Hussey's subordinate, copying Hussey, intervened when a fund portfolio manager complained about Ilytat's market timing and tried to halt it); *id.* at ¶ 37 (Hussey intervened to reverse a stop placed on Ilytat's trading); *id.* at ¶ 77 (Hussey was forwarded an e-mail reflecting an attempt to prevent Columbia Services from restraining Tandem's trading).

As a primary matter, the Complaint alleges a primary violation of Sections 206(1) and 206(2) by Columbia Advisors.[20] The Complaint alleges that Columbia Advisors, an investment adviser registered with the SEC, was the sponsor of the Columbia Funds and that it prepared and, with Columbia Distributor, issued the prospectuses for the funds. *See* Complaint, at ¶¶ 6, 16. The Complaint also alleges that, among other things, "Columbia Advisors had a fiduciary duty to act at all times in the best interests of investors in the Columbia Funds it managed." *Id.* at ¶ 7. The Complaint further alleges that Columbia Advisors, which included the fund portfolio managers, was aware of and approved all but one of the trading arrangements and benefited from the advisory fees that flowed from the trading activity pursuant to these arrangements. *See id.* at ¶¶ 29, 30, 33, 50, 53, 55, 62, 66, 70. In addition, the Complaint alleges scienter with respect to Columbia Advisors insofar as it details instances in which individuals at Columbia Advisors expressed concern about the Preferred Customers' short-term or excessive trading. *See id.* at ¶¶ 33, 34, 36, 41. By placing its own interest in generating fees from short-term or excessive traders above the interests of long-term shareholders to whom this trading posed a risk of harm, by allowing and failing to disclose these arrangements and the conflicts of interest they created, and by making misrepresentations regarding short-term or excessive trading in the funds, Columbia Advisors breached its fiduciary duty to the independent trustees of the Columbia Funds and to the shareholders in the funds where the short-term or excessive trading took place and violated Sections 206(1) and 206(2) of the Advisors Act. *See, e.g., id.* at ¶¶ 5, 6, 7, 8, 92.

---

[20] "The provisions of Sections 206(1) and 206(2) have been interpreted as substantively indistinguishable from Section 17(a) of the Securities Act, except that Section 206(1) requires proof of fraudulent intent, while Section 206(2) simply requires proof of negligence by the primary wrongdoer." *See PIMCO*, 341 F. Supp.2d at 470 (citing *SEC v. Moran*, 922 F. Supp. 867, 896-97 (S.D.N.Y.1996)).

The Complaint also alleges a primary violation of Section 15(c) of the Exchange Act by Columbia Distributor. More specifically, the Complaint alleges that Columbia Distributor, a broker-dealer registered with the SEC, served as the principal underwriter and distributor of the Columbia Funds, and in that capacity, disseminated prospectuses for the funds. *See id.* at ¶ 17. As discussed above, the Complaint also alleges that those prospectuses contained material misrepresentations and omissions regarding short-term or excessive trading. *See, supra,* at Parts II(B), (C). The Complaint further alleges that that Columbia Distributor made the misrepresentations and omissions even though it was aware of and approved the trading arrangements with the Preferred Customers, which generated added revenue. *See id.* at ¶¶ 4, 29, 30, 48, 49, 50, 52, 53, 55, 62, 66, 69, 70, 75. In addition, the allegations of scienter as to Defendants may be imputed to Columbia Distributor, where they were employed as executives. *See, supra,* at Part III. As a result, the Complaint states a primary violation of Section 15(c) by Columbia Distributor.

The Complaint alleges that Defendants aided and abetted the violations by Columbia Advisors and Columbia Distributor because (1) Defendants knew or were reckless in not knowing that the misrepresentations and omissions made by Columbia Advisors and Columbia Distributor regarding short-term or excessive trading were improper and (2) Defendants each knowingly rendered substantial assistance in this conduct by negotiating, entering into, approving and/or allowing these arrangements. *Id.* at ¶¶ 3, 8, 94, 101. Accordingly, because the Complaint states claims of aiding and abetting, Defendants' motions to dismiss these claims should be denied. *See PIMCO*, 341 F. Supp. 2d at 468 (denying motion to dismiss claims of aiding and abetting violations of Sections 206(1) and 206(2)).

**V.**     **Holding Defendants Liable Would Not Violate Due Process**

Defendant Hussey argues that because market timing is not illegal *per se*, it would violate due process to hold him liable for conduct which he could never have known was wrong. He relies upon *Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996),[21] in which the Second Circuit vacated a SEC order censuring the CFO of a brokerage firm for failing to supervise a subordinate who had violated Rule 15c3-3(3) of the Exchange Act. As this Court has noted, *Upton* is distinguishable because in that case,

> 1) the rule was complex, 2) it was undisputed that the firm complied with the literal terms of the Rule at all times and 3) the SEC's interpretation of the rule represented a substantial change in SEC enforcement policy that had not reasonably been communicated to the public. In the case at bar, by contrast, the defendants are charged with fraud and the violation of Rule 10b-5, no doubt the most frequently cited rule in securities law. The defendants were professional (presumably licensed) brokers and cannot claim that they had no notice of the illegality of defrauding mutual funds by making material misstatements or omissions. As the Second Circuit Court of Appeals stated three years after *Upton* when rejecting another due process claim, defendants cannot "credibly claim lack of fair notice of the proscription against defrauding investors."

*Druffner,* 353 F. Supp.2d at 150 (quoting *Valicenti Advisory Servs, Inc. v. SEC,* 198 F.3d 62, 66 (2d Cir. 1999)). The same reasoning applies here. As executives at Columbia Distributor, a registered broker-dealer, with responsibility for selling the Columbia Funds, Defendants cannot claim that they had no notice of the illegality of defrauding investors by making material misstatements or omissions. Accordingly, the Court should reject Hussey's attempt to dismiss the Complaint on this ground.

---

[21] In a footnote, Tambone makes an oblique reference to *Upton* for the proposition that "the Commission may not base the Complaint on alleged conduct that was lawful at the time it occurred." *See* Tambone's Memorandum in Support of Motion to Dismiss, at 9 n.8.

**VI.    Hussey's Violations Prior to February 9, 2000 Remain Actionable in this Enforcement Proceeding**

In his motion, Hussey also seeks to dismiss so much of the Complaint as alleges violations prior to February 9, 2000. The Court should reject this request for several reasons. First, as noted above, the vast majority of the Complaint relates to misrepresentations, omissions, and other conduct that occurred after February 9, 2000. Further, the SEC seeks disgorgement and injunctive relief for these violations. Because there is no statute of limitations governing the SEC's claims to such equitable relief, these claims must stand. *See SEC v. Williams*, 884 F. Supp. 28, 30-31 (D. Mass. 1995); *see also SEC v. Ogle*, No. 99 C 609, 2000 WL 45260, at *3 (N.D. Ill. Jan. 11, 2000) (where SEC seeks equitable relief and penalties, only penalties are subject to limitations period). Indeed, some courts have held more broadly that no statute of limitations applies to SEC enforcement actions at all. *See, e.g., SEC v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004); *SEC v. Rind*, 991 F.2d 1486, 1491-92 (9th Cir. 1993); *SEC v. Downe*, No. 92 Civ. 4092, 1994 WL 67826, at *1 (S.D.N.Y. March 3, 1994); *but see Johnson v. SEC*, 87 F. 3d 484, 492 (D.C. Cir. 1996). Finally, even if the SEC's claims for penalties *were* subject to a 5-year statute of limitations, any violations prior to February 9, 2000 would remain actionable because they were part of a continuing series of unlawful acts that did not become apparent until after February 9, 2000. *See Gaudette v. Panos*, 644 F. Supp. 826, 837 (D. Mass. 1986), *modified on other grounds*, 650 F. Supp. 912 (D. Mass.1986) ("a statute of limitations does not begin to run on a continuing wrong till the wrong is over and done with") (internal quotation marks and citation omitted); *see also McQuesten v. Advest, Inc.*, CIV. A. No. 83-1302-MC-A, 1988 WL 125783 (D. Mass. Aug. 4,1988) (adopting continuing violation doctrine); *Ogle*, 2000 WL 45260, at *3 (same).

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motions to dismiss the Complaint should be denied.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION,**

By its attorneys,

_____/s/_____
Luke T. Cadigan
   Senior Trial Counsel (BBO# 561117)
Celia Moore
   Dep. Asst. Dist. Administrator (BBO# 542136)
David London
   Senior Counsel (BBO# 638289)
73 Tremont Street, Suite 600
Boston, Massachusetts
(617) 573-8919 (Cadigan)
(617) 424-5940 (Facsimile)

Dated: May 16, 2005

## CERTIFICATE OF SERVICE

I certify that on May 16, 2005, I caused a copy of the foregoing to be served by the Court's Electronic Case Filing (ECF) system and by first-class mail upon the following counsel:

**Counsel for Robert Hussey**
Warren Feldman, Esq.
David Meister, Esq.
Wesley R. Powell, Esq.
Clifford Chance
21 West 52nd Street
New York, NY 10019-6131
212-878-8136

Frank A. Libby, Jr., Esq.
175 Federal Street
Boston, MA 02110
617-338-9300

**Counsel for James Tambone**
John Pappalardo, Esq.
John Sten, Esq.
David G. Thomas, Esq.
Greenberg Traurig
1 International Place
Boston, MA 02110
617-310-6000

_____/s/_____
Luke T. Cadigan